COMBS v. EDMISTON.

4-9026                    225 S. W. 2d 26

Opinion delivered December 12, 1949.

*Geo. F. Edwardes,* for appellant.

*Charles H. Morton, Jr.,* and *Arnold & Arnold,* for appellee.

MINOR W. MILLWEE, Justice.    Appellants are husband and wife and prosecute this appeal from an order of the Miller Probate Court denying and dismissing their petition to adopt a child.    We will refer to the mother of the child as appellee, she having intervened in the adoption proceedings with her father as next friend.

Appellee was an unmarried nurse 19 years of age and resided in a nurses' home at Hodge, Louisiana, where the child in question was born on September 26, 1948.    On the night of birth the child was taken to the Volunteers of America, a maternity home at Shreveport,

Louisiana. On September 28, 1948, the maternity home delivered the child to appellants who live near Fouke in Miller County, Arkansas.

Dr. Earnest Blume of Jonesboro, Louisiana, the attending physician, and two nurses, who were friends of appellee, testified that the child was taken to Shreveport at the insistence and with the consent of appellee. Appellee stated that she was under the influence of chloroform at the time and denied any recollection of having given such consent. On October 2, 1948, appellee went to Dr. Blume's office for a physical checkup and was presented with a written consent for the child's adoption. Appellee signed the instrument which was witnessed by Dr. Blume and F. S. Crowson. The instrument was also signed by a notary public who did not see appellee sign the paper, but testified that appellee acknowledged her signature and stated that she understood what she was signing. There was no affidavit attached to the instrument and appellee testified that she signed it without reading it after Dr. Blume represented to her that it was a birth certificate. The written consent was mailed to appellants by the Volunteers of America on October 5, 1948.

Appellee's father, a Baptist minister and timber contractor, residing near Hodge, Louisiana, learned of the child's birth about two or three weeks thereafter. The father and grandfather of appellee made several trips to Dr. Blume's office in an effort to locate the child and ascertain the contents of any writing appellee might have signed. They also made several trips to Shreveport, Louisiana, in an effort to locate the child. The authorities in charge of the maternity home followed a rule of not permitting the mother to ascertain the identity of the prospective adoptive parents. On January 22, 1949, Dr. Blume wrote appellee's father that he had been advised by a person connected with the institution that appellants had the child and their address was furnished. Within 48 hours after receipt of this information appellee, her father and grandfather appeared at appellants' home and asked for the child but appellants declined to surrender it.

The record does not show the date of the filing of appellants' *ex parte* petition for adoption in the Miller Probate Court. The petition was verified October 9, 1948, and alleged that appellee had signed a verified consent to the adoption and that said child would become neglected, delinquent and dependent unless adopted by appellants. On March 2, 1949, appellee, with her father as next friend, filed an intervention in which it was alleged that appellee was a minor under the laws of Louisiana; that she was not made a party or notified of the adoption proceeding; that she did not consent to the adoption and appellants had been so notified; that any alleged consent was not freely and voluntarily given and was obtained while appellee was ill, distressed, under duress and in a critical condition of mind and body; and that such alleged consent was withdrawn. It was prayed that a writ of *habeas corpus* issue for return of the child to appellee and that the petition for adoption be denied.

At the hearing on May 5, 1949, it was stipulated that appellants were of unquestioned moral standing and financially able to give the child the advantages of a good home. The proof also shows that appellee is from a good Christian home and there is no evidence of promiscuity on her part. After birth of her child appellee moved to Ruston, Louisiana, where she is employed as a nurse and resides with her aunt. Her parents reside near Hodge, Louisiana, and are also willing and able to provide a good home for the child.

The trial court found that the appellants were suitable in every respect to adopt the child and that they had properly complied with the laws relating to adoption. The court further found that appellee had signed a verified consent to the adoption, but that she withdrew her consent before the entry of an interlocutory order and that it would be to the best interests of both the child and appellants to deny the adoption.

For reversal appellants contend that the written consent of adoption signed by appellee became irrevocable and that the trial court, therefore, erred in holding

that such consent could be withdrawn before an interlocutory order was entered. Appellee insists that the consent herein was ineffective because it lacked mutuality, was not freely and voluntarily given and was not verified. She further contends that if the consent was validly executed, she had the right to withdraw it at any time before entry of a final decree of adoption.

We do not determine the correctness of the trial court's finding that appellant fully complied with our adoption statute (Ark. Stats. 1947, §§ 56-101 to 56-120, inclusive). Except in certain contingencies not involved in the instant case, § 56-106 requires "the written consent verified by affidavit" of the parents or, in the case of illegitimacy, of the mother. Section 56-108 provides that at the expiration of the 30 day period for defendants to file answers, as provided in § 56-104, the court shall proceed with a hearing and enter a temporary decree, and that the petitioners may apply for final decree after six months from the entry of said temporary decree. This section of the statute further provides that before a temporary decree is entered the court should find, among other things, "that there is proper consent to the adoption" and "that it is for the best interest of the child that such adoption be made."

There is some diversity of opinion among the authorities on the question of whether a natural parent, whose consent to the adoption of a child is a prerequisite to a valid adoption, may effectively withdraw such consent before the adoption has been finally approved by the court. There are two extensive annotations on the question in 138 A. L. R. 1038, and 156 A. L. R. 1011. The general rule is stated in the first annotation as follows: "The rule in a majority of the jurisdictions wherein the question has arisen is that a natural parent's consent to the proposed adoption of a child, duly given in compliance with a statute requiring such consent as a prerequisite to an adoption, may be effectively withdrawn or revoked by the natural parent before the adoption has been finally approved and decreed by the court. Re White, 300 Mich. 378, 138 A. L. R. 1034, 1 N. W. 2d 579; Re Nelms (1929), 153 Wash. 242, 279 P. 748. And see

*State ex rel. Platzer* v. *Beardsley* (1921), 149 Minn. 435, 183 N. W. 956; Re Anderson (1933), 189 Minn. 85, 248 N. W. 657; *Fitts* v. *Carpenter* (1939; Tex. Civ. App.), 124 S. W. 2d 420.'' See, also, 2 C. J. S., Adoption of Children, § 21 a(4).

In the second annotation in 156 A. L. R., *supra,* it is said: ''. . . that the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a 'vested right,' have been forged between them and the child.'' The same trend is noted by the textwriter in the 1949 Cum. Annual Pocket Part to 2 C. J. S., Adoption of Children, § 21a (4), *supra.* But several more recent decisions are also there listed as following the general rule as first stated. Among these are *Green* v. *Paul,* 212 La. 337, 31 So. 2d 819; *Wright* v. *Fitzgibbons,* 198 Miss. 471, 21 So. 2d 709; Application of Graham, 239 Mo. App. 1036, 199 S. W. 2d 68; *French* v. *Catholic Community,* 69 Ohio App. 442, 44 N. E. 2d 113; Adoption of Capparelli, 180 Ore. 41, 175 Pac. 2d 153.

The principal cases cited in support of the trend away from the general rule are *Wyness* v. *Crowley,* 292 Mass. 461, 198 N. E. 758; *Lee* v. *Thomas,* 297 Ky. 858, 181 S. W. 2d 457; and In re Adoption of a Minor, 79 U. S. App. D. C. 191, 144 F. 2d 644. In the first two cases the mother waited more than 15 months after giving consent to the adoption and surrendering the child to petitioners before undertaking to withdraw consent. Matters of equitable estoppel were invoked against the mother in denying the right of withdrawal. The third case above cited involved the interpretation of an adop-

tion statute enacted by Congress for the District of Columbia.

It has also been said that, from a consideration of the cases generally, the question whether the natural parent may revoke consent previously given depends upon all the circumstances of the particular case, which may include such a variety of matters as the terms of the particular statute; the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties between the giving of the consent and the attempted withdrawal; whether the withdrawal was made before or after institution of adoption proceedings; the nature of the natural parents' conduct with respect to the child both before and after consenting to its adoption; the "vested rights" of the proposed adoptive parents with respect to the child; and, in some cases, the relative abilities of the adoptive parents and the natural parent to rear the child in a manner best suited to its normal development, and other circumstances indicative of what the best interests of the child require. Anno. 156 A. L. R., *supra*.

Insofar as the decision here is involved, it is unnecessary to determine whether in all cases consent, previously given, can be arbitrarily revoked at any time before a final order of adoption is made. In the instant case, the consent was withdrawn before an interlocutory order had been entered under a statute which requires a finding by the court that "there is proper consent" at the time such temporary order is made. There can be no doubt that appellee was acting under pressure of embarrassing and humiliating circumstances at the time she signed the consent for adoption. She was a member of a good Christian family and was doubtless fearful of the scandal, shame and unhappiness that might be expected to follow to her child, family and self if she kept the child. Under the pressure of events, she also misjudged the depth of tolerance displayed by a compassionate father. Appellee, her father and grandfather diligently sought to learn the identity of appellants and the whereabouts of the child shortly after execution of the written consent and immediately asked

for its return upon receipt of such information. The consent was revoked before the lapse of a period of time sufficient to show "vested rights" in favor of the adoptive parents with respect to the child. The grounds of estoppel usually invoked in those cases where withdrawal of consent has been denied are not present here. Under all the circumstances, we conclude that the written consent executed by appellee should not be adjudged a final and irrevocable act and was effectively withdrawn before entry of an interlocutory order.

The judgment of the Probate Court is, therefore, correct and is affirmed.