██

A. v. B.

4-9268 233 S. W. 2d 629

Opinion delivered November 6, 1950.
Rehearing denied November 27, 1950.

*Kenneth C. Coffelt,* for appellant.
*Clayton Freeman* and *Robert E. Diles,* for appellee.

LEFLAR, J. This appeal involves two cases which were consolidated for trial below. In one case, Mr. and Mrs. A were petitioners in Probate Court seeking to adopt a child. After entry of an interlocutory order of adoption, but before entry of any final order, Mr. and Mrs. B intervened asking that the adoption be denied and that the child be turned over to them as its natural parents. The other case arose out of a petition filed by Mr. and Mrs. B in Chancery Court against Mr. and Mrs. A seeking custody of the same child. Since the same judge presides in both courts, the cases were tried together. The decision was for Mr. and Mrs. A in each case, and Mr. and Mrs. B. appeal.

The child was born to C, now Mrs. B, but then an unmarried girl, on June 2, 1947. The mother cared for the child herself until February 7, 1948, when she placed it with Mr. and Mrs. A, agreeing to pay them $8 per week for its room and board. This she paid until April 10, 1948. On that date she left for California. The baby remained with Mr. and Mrs. A, but they received no further payments for its board and room.

On November 20, 1948, Mr. and Mrs. A filed their petition for adoption of the child, and on June 17, 1949, the Probate Court's interlocutory order of adoption was rendered. Consent of the mother to the adoption was filed in accordance with Ark. Stats., § 56-106, after the consent form was mailed to her in California and there on February 12, 1949, filled out and returned by her. Evidence at the hearing on the interlocutory order included a report of the Child Welfare Division of the State Department of Public Welfare to the effect that Mr. and Mrs. A were "conscientious, hardworking people, regular in their habits and financially able to assume the responsibility of rearing this child in a modest but wholesome manner." It was brought out that they owned their own suburban home, which was modern and comfortably furnished, that Mr. A. was a carpenter by trade, that he also owned a farm, that they had given the child good care and were attached to it, that the child was in poor physical condition due to malnutrition when

it was turned over to them but that they, by medical care and personal attention, had restored it to good health.[1] It was on the basis of this evidence that the interlocutory adoption order was issued.

Appellant Mr. B is the putative father of the child. At the time of its birth, and until September 2, 1949, Mr. B, a sergeant in the U. S. Army, was married to another woman. On the date named his wife secured a divorce from him, and custody of their children. Then on October 15, 1949, he and C were married. Early in January, 1950, they filed their custody suit and their intervention in the As' adoption proceeding. At the trial thereof, as already stated, Mr. and Mrs. A prevailed.

The principal argument presented for reversal, on behalf of Mr. and Mrs. B, is that the adoption order is ineffectual without the consent thereto filed by the mother, and that this consent was withdrawn before any final order of adoption was issued.

We have had occasion once before to discuss the question whether a consent to adoption filed under § 56-106 by the mother of an illegitimate child is final and conclusive on the mother, or can be withdrawn by her. In *Combs* v. *Edmiston,* 216 Ark. 270, 225 S. W. 2d 26, our holding was that such consent could be withdrawn, under the circumstances of that case, prior to the entry of the interlocutory decree of adoption. We also mentioned, but had no occasion to pass upon, the question whether a consent given in statutory form by the mother could be withdrawn after entry of an interlocutory order of adoption and before final order, so as to defeat the adoption.

As pointed out in *Combs* v. *Edmiston,* there are three lines of authority on the latter question. The weight of authority among the older decisions was that the natural parent's consent to adoption might be effec-

---

[1] The report of the Child Welfare Division also pointed out that the families of the child's natural parents lived in the same community as Mr. and Mrs. A, and knew where the child was, which fact might cause trouble in the future, and for this reason only the Division's recommendation was against the adoption. The soundness of this recommendation as an original matter, is evidenced by the present litigation.

tively withdrawn or revoked at any time before the adoption was finally approved and decreed by the court. *Re White's Adoption,* 300 Mich. 378, 1 N. W. 2d 579, 138 A. L. R. 1034. But it was pointed out that "the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a 'vested right', have been forged between them and the child." See *Re Adoption of a Minor,* 79 U. S. App. D. C. 191, 144 Fed. 2d 644, 156 A. L. R. 1001. Finally, we stated the third view in the following language:

"It has also been said that, from a consideration of the cases generally, the question whether the natural parent may revoke consent previously given depends upon all the circumstances of the particular case, which may include such a variety of matters as the terms of the particular statute; the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties between the giving of the consent and the attempted withdrawal; whether the withdrawal was made before or after institution of adoption proceedings; the nature of the natural parents' conduct with respect to the child both before and after consenting to its adoption; the 'vested rights' of the proposed adoptive parents with respect to the child; and, in some cases, the relative abilities of the adoptive parents and the natural parents to rear the child in a manner best suited to its normal development, and other circumstances indicative of what the best interests of the child require. Annot., 156 A. L. R. 1011."

Of these three views, we now conclude that the one last stated is preferable. It is the one under which maximum consideration can be given to the welfare of the child itself while at the same time the interests of the competing adults can be given fair weight. It has less of arbitrariness about it than has either of the more extreme views.

Applying then the rule which permits consideration of all the surrounding circumstances in the case, we hold that the mother's consent in the instant case could not be withdrawn, as was attempted. The baby has lived with Mr. and Mrs. A for most of the three years of its life; they are the only parents it has really known. The mother left it in their hands and made no effort to support it or secure its custody from April 10, 1948, until the custody suit was filed in January, 1950. She gave her consent to the adoption freely and without any suggestion of coercion—there were no questionable incidents to the consent such as were present in *Combs* v. *Edmiston, supra.* The putative father, now the mother's husband, never at any time supported or offered to support the child to any extent whatever, and even appeared somewhat reluctant, in the course of his testimony, to say that he would pay Mr. and Mrs. A for caring for the child in case it should be awarded to him and his wife. Mr. and Mrs. A have a good home in which to keep the child, whereas Mr. and Mrs. B have no home. Mr. B testified that he intended to make service in the Army his life career, that he expected to be ordered overseas shortly, and that he hoped to make arrangements for his new wife and the baby to follow him overseas later. He suggested no plan as to how they would live in the meantime.

Next, it is urged on behalf of Mr. and Mrs. B that the baby became the legitimate child of both of them, by reason of the father's subsequent marriage to the mother and recognition by him of the child as his own, under Ark. Stats., § 61-103. From this it is argued that consent by the mother alone, to the adoption, does not satisfy the requirements of the adoption statute, § 56-106,

since consent by the mother alone suffices only in the case of an illegitimate child. The answer to this is that the adoption is effective as of the date of the interlocutory order, unless later set aside at the final hearing for good reason (§ 56-108), and the consent is required as of the date of the interlocutory order. At the relevant date in this case the child was illegitimate; and the adoption had already become effective, subject to the final hearing, when his natural parents married each other.[2]

We find in the record no reason for refusing final approval to the interlocutory order of adoption, despite the intervention. Since the right to custody of the child depended upon the outcome of the adoption suit, the petition by Mr. and Mrs. B for custody must also fail. The order and decree appealed from are affirmed.

---

[2] A separate ground that might possibly have been relied upon by the adoptive parents is the provision in § 56-106 that "the consent of a parent or parents may be dispensed with if . . . the parent has abandoned the child for more than six months next preceding the filing of the petition."