MARTIN *v.* FORD.

5-655                                277 S. W. 2d 842

Opinion delivered April 18, 1955.

*Johnston & Rowell,* for appellant.

*Quinn Glover,* for appellee.

ROBINSON, J. Katherine Martin, a single girl sixteen years of age, lived with her widowed mother in a three room house on the outskirts of Morrilton. She became pregnant, and her mother, Mary Martin, sold a portion of a small tract of land she owned and brought Katherine to Little Rock to get away from the embarrassing situation in their hometown where Katherine was known.

At first, Katherine obtained accommodations in a home in Little Rock which maintains facilities for unwed mothers; but, not being satisfied with that situation, she and her mother rented an apartment. Other people living in the apartment house recommended a doctor for

Katherine. She followed their suggestion and went to the doctor about three weeks before her baby was born. It appears that the doctor, in good faith, recommended to Katherine that she permit her baby to be adopted, pointing out to her the hardships that would be visited upon the child by living in a small community where all would know of his illegitimacy. The doctor also reminded Katherine that she was not in a good position to support the child, being young, inexperienced and untrained for any particular work, and having no relatives that could help her except in a small way. Katherine's mother was over sixty years of age and, at the time of the hearing in the Probate Court, had only about $100.00 remaining from the money she had received from the sale of her property. The only other relative that Katherine could call on was a brother, twenty years of age and in the Navy, who had a take home pay of about $45.00 a month.

After discussing the matter with her mother, Katherine concluded that she would permit the baby to be adopted by appellees herein, a childless couple that the doctor knew who wanted a baby. Hence, it was agreed that the appellees would be permitted to take possession of the child immediately after his birth and to legally adopt him. Anticipating the adoption, Katherine obtained no clothes or other necessary articles for the baby.

The child was born about 1:30 a. m., November 14, 1953. Approximately thirty minutes thereafter, the doctor presented to Katherine an agreement which she signed purporting to give appellees permission to adopt the baby. About five o'clock that morning, Katherine returned to her home in an ambulance, and two days later, on November 16, an attorney representing appellees came to her apartment where she signed an additional consent to the adoption. Her mother also signed the consent. Appellees immediately filed a petition for adoption. A short time thereafter, Katherine went on a trip to California to visit relatives.

On January 7, 1954, the court entered an interlocutory order of adoption. In March, Katherine returned from California and went to see the attorney for the appellees, stating to him that she wanted to regain custody of her baby; she had changed her mind with reference to the adoption. Appellees, the Fords, declined to give up the baby, and on May 24 Mary Martin, mother of Katherine, as next friend filed an intervention protesting the adoption. The cause was tried on August 2, 1954. After hearing all of the testimony, the court entered a final order of adoption.

Questions are raised with reference to notice and the fact that no guardian was appointed for Katherine. However, she appeared and testified at the final hearing, and was of age at that time. Hence, we consider these contentions to be without merit.

There are really only two questions for determination. First: did Katherine give valid consent to adoption? Second: do the facts in the case support the order of adoption? Katherine was seventeen years of age when she gave consent to the adoption, and eighteen years of age at the time of the hearing at which the final order was made. Ark. Stats. § 56-106 provides:

"(c) In case of illegitimacy, the consent of the mother shall suffice except where paternity had been established by judgment or order of a court of competent jurisdiction.

(d) The minority of a parent shall not bar or in any way vitiate his consent to an adoption."

In accordance with the statute, Katherine, although only seventeen years of age at the time consent to the adoption is alleged to have been given, was nevertheless capable of giving valid consent. It being determined that she could give legal consent, the next question is did she do so.

No reasonable person would contend that the agreement she signed about thirty minutes after giving birth

to the child would, in itself, constitute valid consent. But this is not the whole picture.

Prior to the birth of her child, she had considered the adoption, had discussed it with her mother, and had decided to consent thereto. Moreover, two days after her child was born, while in her own apartment, she and her mother signed an additional consent for the adoption of the baby. Taking these facts into consideration, along with the fact that in the circumstances existing it was not unreasonable to permit the adoption, it is our conclusion that Katherine did give her valid consent to the adoption prior to the interlocutory order.

Undoubtedly, she could have revoked her consent before the interlocutory order was made, as was held in *Combs* v. *Edmiston,* 216 Ark. 270, 255 S. W. 2d 26. However, she made no attempt to withdraw her consent before that order was entered. Whether she may do so between the time the interlocutory order is entered and the final order is made is controlled by the rule announced in *A.* v. *B.,* 217 Ark. 844, 233 S. W. 2d 629. There it is held:

"The question whether the natural parent may revoke consent previously given depends upon all the circumstances of the particular case, which may include such a variety of matters as the terms of the particular statute; the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties between the giving of the consent and the attempted withdrawal; whether the withdrawal was made before or after institution of adoption proceedings; the nature of the natural parents' conduct with respect to the child both before and after consenting to its adoption; the 'vested rights' of the proposed adoptive parents with respect to the child; and, in some cases, the relative abilities of the adoptive parents and the natural parents to rear the child in a manner best suited to its normal development, and other circumstances indicative of what the best interests of the child require."

Do the facts support the order of adoption made by the probate Court when the above rule is applied?

The mother is still very young; she is not married and is untrained in any kind of work. She has no way of caring for the baby personally and must depend on others for help. Her mother, Mary Martin, is getting old and is not financially able to help very much. A brother is willing to give some assistance, but he is earning scarcely enough for his own needs.

Without the baby, Katherine could lead a normal life. In all probability, she will get married and have other children, whereas if she had custody of the baby, that in itself might prevent such a marriage. She proposes to take the child back to a small town where everyone in the community would know of her plight. It is very doubtful that she would be happy in a situation of that kind. Certainly, it would not be in the best interests of the child. It would be intolerable for this little boy to have to grow up in a small town where all of his playmates would know of his illegitimacy. No doubt he would be teased about his condition, and his suffering might result in damage from which he would never recover.

The adoptive parents are good, substantial citizens. Their financial condition is such that they can support the child in a proper manner. Mrs. Ford resigned her job, where she was earning $225.00 a month, to give her full time to the care of the baby. Undoubtedly, they now love the child as their own. They took him in the beginning in good faith and, although their feeling in the matter is not controlling, this certainly is a point to be considered.

Applying the rule as announced in *A.* v. *B.* to the facts in this case, we are of the opinion that the Probate Court was correct in arriving at the conclusion that the child should be adopted to the appellees.

Affirmed.

The Chief Justice concurs.

Justices MILLWEE and WARD dissent.

WARD, J. I am compelled, after due consideration of our own decisions as well as the laws of nature, to disagree with the majority opinion in this case.

*Former decisions.* Prior to this date we have had occasion only twice to pass upon an issue closely related to the one here considered. In *Combs* v. *Edmiston,* 216 Ark. 270, 225 S. W. 2d 26, we held that the mother of an infant who had given her written consent for adoption could, before the interlocutory decree had been issued, withdraw her consent. Although there might be different views as to the exact crux of that decision, as will be later noted, I interpret it to be as above stated because of the following language used by the court. "In the instant case, the consent was withdrawn before an interlocutory order had been entered under a statute which requires a finding by the court that 'there is proper consent' at the time such temporary order is made."

If therefore we did hold, as I think we did, that a written consent of adoption given by the mother amounts to no consent when it is revoked, then I cannot see how we can hold there is any consent in the case under consideration where the mother revoked the written consent. If she can revoke her consent at one time I can see no logical reason for holding that she cannot revoke her consent at another time. There is however one exception, and that is where "vested rights" on the part of the adoptive parents have accrued between the time the consent is given and the time it is revoked. In the case we are considering the majority opinion cannot be justified on the ground that appellees had "vested rights" in the baby—they only had it a short while and then with full knowledge that legal proceedings were pending.

In the *Combs* case the court went further, however, and discussed the circumstances surrounding the attempted adoption, calling attention to the fact that the mother was "acting under pressure of embarrassing and humiliating circumstances at the time she signed the

consent" . . ., that she "was doubtless, fearful of the scandal and shame and unhappiness that might be expected to follow" . . . and that "the consent was revoked before the lapse of a period of time sufficient to show 'vested rights' in favor of the adoptive parents with respect to the child."

Let us then view the case under consideration under the rule that "surrounding circumstances" applies in cases of this nature. This is the rule announced in *A.* v. *B.*, 217 Ark. 844, 233 S. W. 2d 629, which appears to be the authority relied on by the majority. Therefore it is pertinent to consider this case from that standpoint.

*The comparison.* In the *Combs* case, *supra*: The mother was 19 years old; The child was born September 26, 1948; It was delivered to the adoptive parents two days later; On October 2, 1948 the mother voluntarily went to her doctor's office and signed the consent; On October 9, 1948 the adoption petition was filed, and; On March 2, 1949 the mother intervened and asked to have her consent cancelled. Under those circumstances the court said the adoptive parents had not had the child long enough to acquire "vested rights."

In the *A.* v. *B.* case, *supra*; The child was born June 2, 1947; The mother kept the child until February 7, 1948 when she turned it over to the prospective adoptive parents; On November 20, 1948 the petition for adoption was filed; On February 12, 1949 the consent was mailed to the mother in California where she voluntarily signed it; On June 17, 1949 the interlocutory order was granted, and; In January, 1950 the mother intervened. The court, in refusing to allow the mother to revoke her written consent, quoted with approval: "The proposed adoptive parents have taken the child into their custody and care for a substantial period of time and bonds of affection in the nature of 'vested right' have been forged between them and the child." Also in reaching its conclusion and in applying the "circumstances" rule the court said: "The baby has lived with Mr. and Mrs. A. for most of the three years of its life; They are the only parents it

has ever known. The mother left it in their hands and made no effort to support it or secure its custody from April 10, 1948, until the custody suit was filed in January 1950. She gave her consent to the adoption freely and without any suggestion of coercion—there was no questionable incident to the consent such as were present in *Combs* v. *Edmiston, supra.*"

*The case under consideration.* The mother who was only 17 years old gave birth to the baby November 14, 1953 at 1:15 A.M.; Before she had fully revived from the sedatives those in attendance had her sign the consent for adoption; Two days later an attorney called on her and had her to sign another consent for adoption; On the very same day a petition for adoption was filed; On January 7, 1954 the interlocutory order was signed and on May 24, 1954 the mother intervened asking to withdraw her consent. It is significant also that for two or three weeks before the child was born the adoptive parents had been selected and during this time the doctor who attended her promised free medical care apparently for the purpose of influencing the decision she later made.

Thus it appears: (a) That in the *Combs* case, *supra,* six days elapsed after the child was born until the mother signed the consent while in the case under consideration only a few minutes elapsed; (b) In both instances approximately the same period elapsed between the time the consent was signed and the time the mother attempted to revoke, and; (c) There were more ''questionable incidents to the consent'' in the case under consideration than there were in the *Combs* case.

In the *A.* v. *B.* case, *supra,* relied on by the majority, the ''circumstances'' were entirely different from those in either the *Combs* case or the one under consideration. There the child was born June 2, 1947 and the consent was signed February 12, 1949, the mother did not attempt revocation until July 1, 1950, and there were no ''questionable incidents to the consent'', as there stated by the court.

It is impossible for me to conclude that the decision in the *A. v. B.* case, or the facts and circumstances of that case, justify an affirmance of the case under consideration.

In both the *Combs* and *A. v. B.* cases the court seemed to give consideration to the welfare of the child and to the financial ability of the adoptive parents as opposed to the financial inability of the natural mother. I recognize that such consideration has great significance in divorce cases and child custody cases, but I also think that no such significance should attach in a case of this kind. Otherwise many of us should give our children to people in better financial circumstances. No person and no court can confidently say material wealth is always better for a child than its own mother's love and care, and no one has yet suggested a way to soften the grief of a mother who is forced to give up her child. Under the law announced by the majority we have three decisions in hopeless confusion, and I can see no clear cut rule to guide litigants.