v.

SOCIAL SERVICE AND CHILD WELFARE DEPARTMENT OF the RELIEF SOCIETY GENERAL BOARD ASSOCIATION OF The CHURCH OF JESUS, CHRIST OF LATTER–DAY SAINTS, Defendant and Respondent.

No. 10892.

Supreme Court of Utah.

Aug. 28, 1967.

Franklyn B. Matheson, Salt Lake City, for appellant.

Earl S. Spafford, Salt Lake City, for respondent.

HENRIOD, Justice.

■ I take it that most everyone will agree that there is a strong presumption that a baby is better off with its natural mother;[1] that such presumption must be overcome only by clear and convincing evidence;[2] that even though a written consent is given by her, it is revocable under certain circumstances;[3] that a pregnancy experienced by a single woman generally is fraught with emotional upset, fear of social consequences, economic problems and unusual reactions that make a woman under such circumstances subject to unusual pressures.[4]

This never-married girl of 34, employed and self-supporting, became pregnant under circumstances unrevealed in the record. It may have been the result of promise of marriage, while under the influence of a happy birthday party, or otherwise. Whatever the reason, there is absolutely nothing to indicate she was loose, promiscuous or a lady of the pavements. It is conceded she had never been pregnant before. Her age, without any suggested similar intimacies,

1. Harrison v. Harker, 44 Utah 541, 142 P. 716 (1914); In re Adoption of D_____, 122 Utah 525, 252 P.2d 223 (1953).
2. In re Adoption of Walton, 123 Utah 380, 259 P.2d 881 (1953); In re Williams' Estate, 10 Utah 2d 83, 348 P.2d 683 (1960).
3. Taylor v. Waddoups, 121 Utah 279, 241 P.2d 157 (1952); Williams v. Capparelli, 180 Or. 41, 175 P.2d 153 (1946); Skaggs v. Gannon, 293 Ky. 795, 170 S.W.2d 12 (1943).
4. In re Adoption of D_____, footnote 1, supra; Combs v. Edmiston, 216 Ark. 270, 225 S.W.2d 26 (1949).

the fact of her employment and religious background are circumstances that at least presumptively suggest otherwise, and, that she was a chaste, employed, moral, Christian young woman. The child agency, defendant here, did not question her morality, financial ability or fitness to rear and educate this child. The doctor who delivered the child told the appellant that she was competent emotionally and stable and was able to take care of a child, and the trial court conceded that no one questioned that conclusion in this case.

Appellant sought the advice of her brother, a doctor in a small town where she resided and was employed, who discovered her pregnancy. He promptly told her to get out of town in language that at least impliedly appeared to weigh his own embarrassment against that of his sister at a time when she needed him most. He equally advised her to get rid of the child. She went to Salt Lake City, retained a local doctor who also advised her that without a father, on social and moral grounds, she should place the child out for adoption when it was born.

On at least 10 visits over a three-and-a-half-month period he constantly and on each occasion urged that she dispose of the baby. He referred her to a social service worker attached to the hospital who had a liaison with the L. D. S. placement agency. Appellant expressed concern about meeting her hospital and doctor bills incident to the birth, and indicated that she wanted to go back to work to pay them. There is nothing clear about it in the record, but there is a strong inference that at that juncture almost everyone knows that the expectant mother is assured by someone that such expenses would be borne by someone else. Another employee of the agency gave appellant the "benefit of my experience" to the effect that it would be to her advantage to place the child for adoption, and that this would be the right thing to do. The social worker also advised her that the agency would wait for two or three days after the birth before presenting the consent to assure that appellant would not be under the influence of any anaesthetic. The consent was obtained about 24 hours after the birth.

It must be remembered that this case involves the question of reasonableness of time within which the consent was revoked, the circumstances surrounding it, and the question of undue influence,—not what some big brother, doctor, nurse or social worker thought appellant should do.

Appellant was a Catholic. Her doctor suggested that there were a number of placement agencies. The L. D. S. agency was suggested specifically, however. Testimony that she requested the L. D. S. agency instead of a Catholic placement agency is somewhat incredible without some sort of persuasion that influenced her selection. If there were such persuasion, of which the record seems to reflect a likelihood, it came

from the same doctor,—her own, in whom she must have had confidence,—who strongly urged her to dispose of the child when born.

About a month later, an employee of the L. D. S. agency met with appellant, the only contact before the birth of the baby. The agency worker said she showed her the paper she would have to sign and that she read it. Two and a half months later, on December 16, appellant was admitted to the hospital at 4:30 a. m. experiencing hard, irregular contractions, which continued for seven and one-half hours. Her membranes had ruptured at 9:30 p. m. the day before. At 12:30 p. m., on December 16, the doctors tried to stimulate labor, but gave up after five hours because she "had a fatiguing day." Her sleep thereafter was interrupted by periodic contractions. A decision was made to take the baby by Caesarian section. The operation was performed at 1:45 p. m. the following day and the birth was at 2:07 p. m., which culminated 34 hours of continuous and painful contractions. At 3:30 p. m. she was given Vistaril and at 6:45 p. m. was given Demerol,—both narcotic drugs. At 2:30 a. m. and 9:40 a. m. of the 18th Demerol again was administered. She complained of severe headaches at this time. A sister visited her at 1:30 p. m., who said "she wasn't herself." A brother (not the physician brother) came at 3:00 p. m., but stayed only five minutes and left when the Relief Society agent

came, and in his absence obtained appellant's signature to a written consent to adoption. He says he remained in the hall for about 35 minutes when the worker came out of the room and said that for a minute she didn't think appellant would sign but she finally got her signature, which the worker denied. The worker said appellant started to cry and was crying when the former left, and that appellant, before signing said, "Yes, I might as well do it now." Appellant testified that she did not remember the visits of her sister, brother, or the Relief Society worker. A competent doctor testified this very well could be so and yet she still could have signed her name without realizing what she was signing. It is admitted that appellant had an injection of a narcotic drug only five hours before signing a so-called consent. A medical expert testified that her actions evidenced an acute brain syndrome that would have directly affected her judgment. The evidence indicated that her own doctor did not examine her until three hours after she signed the release, and that he could not determine what her mental disposition was when it was signed. The only testimony offered by the respondent as to appellant's mental condition at the time the consent was signed was that of a nurse and a social worker,—in no sense experts,—and her doctor, who admitted he did not know,—amounting to no expert testimony at all. On the other hand, an expert medical man testified that from

the evidence, he was of the opinion she was not normal mentally and that her judgment was impaired. Everyone who testified conceded that she was upset, crying, and that it was an ordeal for her.

On December 21, appellant executed a hospital release to the Relief Society. At the time of hearing there is nothing to reflect where or with whom the child's custody was reposed, and no one has or will tell of its whereabouts.

On December 23, appellant was released from the hospital. Only one week later she contacted her doctor in an effort to get her baby. This certainly was a revocation within 13 days. Only five days after that she contacted the placement agency for the same purpose and was given no information or consolation except to be advised to see an attorney,—which she did, followed by this petition only four days later,—only three weeks after she signed a so-called "consent" to adoption,—and only three weeks and one day after the birth of her baby, what with all the red tape. Counsel for the agency admitted that at date of trial no petition for adoption had been filed. This concession was made on January 20, the time of trial, at which time the infant was only a month old. On January 24, the hearing was concluded and on the ninth day of February, and two weeks later, the findings and conclusions were signed by the trial judge, when the child was less than two months old—a compliment to the court

and counsel for appellant for the expedition of this case. In 10 days counsel filed a motion for new trial, which the court denied on April 6, at which time the child was about three and a half months old. On the very same day, counsel for appellant filed an appeal to this court and the record was received here on April 23, at which time the child was only four months old. Appellant filed briefs on May 23. On June 7, four days before the arguments for the June term calendar were scheduled, the respondent asked for and received an extension of time to file its brief to June 26, which was nine days after the term expired,—which extension normally would have thrown the argument of this case over to September, October or perhaps November, thus delaying it for at least three months, and probably longer. Nonetheless, attorney for appellant, on June 9, only two days after the request for and the order granting respondent until June 26, with dispatch and alertness made a motion for a special hearing in this court,—almost obviously to prevent three months more delay which would bolster respondent's argument about attachment, affection and welfare of the child for those in whose custody it had been placed. This court, considering the motion to be well taken, set the case for special hearing on June 26, the date when respondent's brief was due under the extension given to it. The case was argued on that day and submitted for our decision.

Counsel for respondent really cites only one case to support its conclusion: In re Adoption of D.[5] It is surprising that it should cite this case, because 1) it is factually miles away from here, and so far apart from the instant case as to be impertinent, and 2) it is legally in harmony with this opinion. Therefore, we cite the same case in support of our position.

The child, the subject of the adoption, had lived its entire four-and-one-half-year life with someone other than its natural parents. Two and a half years were spent with its grandma, and two with the adopting parents. The grandmother and other relatives importuned the young lady to take care of her child or let someone else do it by way of adoption since the grandmother, because of economic inability, age and infirmities, no longer could care for the child. The natural mother ignored not only this advice but also her natural child. Consequently the grandmother turned the custody of the child over to the respondents, who petitioned for the adoption. The appellant mother, even at that time, not only did not bother to visit her child, but evinced no objection to the adoption. On the contrary, actually and voluntarily she went into open court and willingly signed a consent to the adoption. Her husband was out of the state, which delayed the adoption somewhat, but on return he too signed a written consent to the adoption, also in open court. It was only at the time when the final hearing was to be had that the mother tried to revoke her consent. This procedure, in my opinion, had all the earmarks of an attempted shakedown, and I am inclined to believe the trial court shared such conclusion. Whether it was or not, that case has absolutely no resemblance to the case here, where the mother revoked her consent in record time and actually had the matter before the court three weeks after the child was born.

Without repeating the two paragraphs written by Mr. Justice Crockett in the D. case, I commend the reader to re-read them, with which language we agree under the facts of that case, and in which I concurred in 1953. A casual reading of those excerpts clearly will demonstrate that Mr. Justice Crockett said that *under the circumstances of that case* the mother had no arbitrary right of revocation. He was right, but the case has no simile here.

Taylor v. Waddoups,[6] a case decided by us in 1952, is interesting at this juncture.

In that case Mrs. Taylor, the plaintiff, married Mr. T. in 1940, divorced him in 1944, remarried him in 1946, divorced him again in 1950, after bearing him five children. Mr. T. did not support the family and periodically deserted them, forcing Mrs. T. on relief. During 1948–50, Mrs. T. was ill and unable to work to support herself

5. 122 Utah 525, 252 P.2d 223 (1953).

6. 121 Utah 279, 241 P.2d 157 (1952).

and the children. Consequently *she re-quested the welfare people to find a home to place her children.* Three of them were placed with the Waddoups. Mrs. T. went to California in 1949 in an attempt at reconciliation with Mr. T. They returned to Utah shortly thereafter when, after two months Mr. T. again deserted her. Her health disintegrated and she was on relief. She told the Waddoups that if they "wanted some children she had some to give away." Waddoups returned in March, 1950, with a prepared consent to adoption, which both Mr. and Mrs. T. signed before a notary public. It was conceded that there was an understanding that the children would be returned if her health improved. Nine months later Mrs. T. asked for the children and was refused, and a week later obtained her second divorce from Mr. T. Mrs. T. then married another man. Waddoups filed the consent in court on January 5, 1951, and an adoption decree was entered on January 8th without further notice to Mrs. T., who on February 26th, a month and a half later, filed a petition for writ of habeas corpus which was granted, and the adoption decree was vacated. The case went off on the ground that the consent was not executed as required by statute, but the important phase of the case is that it recognized the right of a natural parent to revoke a written consent, and as pointed out, when the question of undue influence is an issue "the court should carefully scrutinize the evidence lest an honest, worthy and well-meaning natural parent be unjustly deprived of her child."

The pressure brought to bear on the appellant in the instant case by her doctor brother, her own doctor, her sister and the placement agency, to the exclusion of counsel by others, and a sort of mental inoculation against it, and the immediate revocation of her consent, after it was obtained only a day after a Caesarian birth, (which any mother, under such circumstances, will tell us is enough, of itself to stultify one's mind for a considerable time,—certainly beyond one day)—plus the conceded fact that narcotic sedation took place many times before and after the birth and within five hours before the so-called consent was signed, does not impress us with any conclusion that this girl was fully alert and conscious of the serious consequences of her signature or had a keen comprehension of the terms of a long, drawn-out legal document put to her in a matter of hours after a painful birth, which pain obviously was attempted to be alleviated by repeated doses of drugs. Frankly, I don't believe she read anything contained in the so-called consent except a blank line which someone pointed out for her signature. If she did read it she was out on cloud nine and did not understand it. I arrive at this conclusion after having read the record in this case three times.

Mr. Justice Crockett in the D⸺ case had this to say:

> Reading of many cases on this subject teaches that each depends upon its own facts: the circumstances of the placement of the child; those under which the consent was given; the length of time the adopting parents have had the child; any "vested rights" that have intervened; the welfare of the child; the conduct, as well as the character and ability of the respective claimants; these and the particular governing statute are all given consideration in determining whether the consent may be revoked.

■ With that enunciated criteria, there is no question in my mind but that the appellant, under the facts reflected in the record in this case, should be granted the relief she prays for without hesitation. The equitable principles stated in the quotation above apply to her cause more than to any other litigant's about whom I have read, and if we should turn her away in this case, it would seem that the above quotation is but a juxtaposition of meaningless words.

In a case quite similar to the instant case, State ex rel. Platzer v. Beardsley,[7] an unwed mother gave birth to a child on February 20, signed a written consent to adoption on April 30, the child being received by the adopting parents on May 18 followed by a petition for adoption on May 23, when at the hearing, the mother appeared and revoked her consent and filed a petition for writ of habeas corpus. The agreement said the mother was destitute and unable to care for the child. The opinion said what we think is so apropos of the facts and principles applicable here as to justify its quotation at length, as follows:

> * * * It does appear that on April 30, when the mother consented to part with her child, she was destitute. It also appeared from the allegations in the return that she has no suitable home or place where she can keep her child, and that she is without means to support it. There is no showing that this condition will continue. Appellants assert that the law presumes that a condition once shown to exist will continue until the contrary is made to appear. Granting that this is so, we are unwilling to dispose of a child solely on the strength of a rule of evidence. There is nothing to show that respondent is unable or unwilling to work and earn enough to support herself and her child. We do not know whether she has relatives or friends able and willing to help her, or where or how she lives. In short, we are left wholly in the dark as to matters of vital importance in determining whether she should be deprived of her natural right to her child. The ties by which mother and child are bound together should not be severed ex-

7. 149 Minn. 435, 183 N.W. 956 (1921).

cept for grave and weighty reasons. The fact that this child may receive, at the hands of appellants, a better home than respondent can provide, is not a sufficient reason for depriving her of her offspring. State v. Armstrong, supra [141 Minn. 47, 169 N.W. 249.] The mere fact that a mother is so destitute or impoverished that she cannot adequately provide for the needs of her child, and that someone else is willing to take it and give it better educational and material advantages, does not justify the court in transferring its custody.

Aside from the fact that respondent has given birth to an illegitimate child, there is nothing to show that her character is such that she ought not to have its custody. It is suggested that she does not care for and was anxious to be relieved of it, or she would not have signed the agreement with appellants. Any force there may be in this suggestion is overcome by the fact that five days after she gave up her child she sought to regain it. It is urged that she cannot keep it, but will give it to someone who can provide for it. Assuming this to be true, the future welfare of the child will not be secured by leaving it with appellants, with no other right to its custody than the right of possession. Doubtless they are excellent people and would give the child a good home, but, until the mother's legal rights have been cut off by a decree of adoption, there can be no assurance that the ties of affection formed by the constant association of a child with its elders may not be severed at any time. This result would be detrimental to the welfare of the child and the source of lasting grief to appellants. The future should be definitely settled. It cannot be if the mother is unable to care for the child herself unless she consents to its adoption by someone to whom she is willing to entrust it. It is regrettable that appellants have been unable to obtain such consent. Without it there can be no permanent solution of the problem. We think it is best to restore the child to its mother, to be cared for by her or such other persons as may wish to adopt it with her consent.

Let's take another case that is very similar to our case, that of Combs v. Edmiston.[8] The mother, 19, and an unwed employed nurse, bore an illegitimate child on September 26, 1948. It was turned over to a placement agency the same day and two days later given to the Combs. The obstetrician and two nurses, all friends of the mother, said the transfer of the child was at the insistence of and with the consent of the mother. She said she had been under the influence of chloroform at the time and denied having given the consent. She signed a consent four days later on the oc-

8. 216 Ark. 270, 225 S.W.2d 26 (1940).

casion of a physical checkup, when she was presented by her doctor with the written consent to an adoption. All this in the presence of her doctor and another, and her signature was witnessed by a notary public. A few weeks later her father and grandfather learned of the birth, and tried to find the persons having the custody of the child, but nobody, including the doctor would help, until the latter finally gave them a clue. They pursued the information, contacted the Combs, demanded the child and were met with refusal. The mother intervened in a then pending adoption proceeding. It was conceded that the Combs were morally and financially capable of providing a good home. It was also shown the mother came from a good Christian family and was not promiscuous. The court found that the mother had signed the consent, but effectively had withdrawn it, and denied the petition for adoption. The Combs, on appeal, claimed that the written consent was irrevocable. The trial court would not buy this argument, and after setting out the factors to be considered in a case like this, which were substantially the same as those enumerated by Mr. Justice Crockett in the D——— case, had this to say:

There can be no doubt that appellee was acting under pressure of embarrassing and humiliating circumstances at the time she signed the consent for adoption. She was a member of a good Christian family and was doubtless fearful of the scandal, shame and unhappiness that might be expected to follow to her child, family and herself, if she kept the child. Under the pressure of events she also misjudged the depth of tolerance displayed by a compassionate father. * * The consent was revoked before the lapse of a period of time sufficient to show "vested rights" in favor of the adoptive parents with respect to the child. The grounds of estoppel usually invoked in those cases where withdrawal of consent has been denied are not present here. Under all the circumstances we conclude that the written consent executed by the appellee should not be adjudged a final and irrevocable act and was effectively withdrawn before entry of an interlocutory order.

How much closer can you get to a case in point? Without unnecessary repetition, it is submitted that the case of Green v. Paul, 212 La. 337, 31 So.2d 819 (1947) says about the same thing as the Combs case, supra, in a case where a father of a seven-year-old daughter gave a written consent to adoption, revoked it and after the trial court said he couldn't do it and granted the adoption, on appeal the trial court was reversed. Another case of similar import, where consent in writing to an adoption was given and later revoked, the trial court said it could

not be done. Nonetheless on appeal the decision was reversed by the appellate court.[9]

 I am not impressed in this case with the rather worn cliché about the trial court being in a better position to determine weight and credibility and that we should not substitute our judgment for his unless we are convinced he made improper findings. There is just as valid a rule to the effect that we must do our own weighing and find our own facts in an equity case like this, and we are convinced that this court would not be rendering an equitable judgment under the facts of this case if it became a party to denying forever the mother here of her association with, love and affection for the natural product of her flesh and blood,—particularly after she so

quickly after the birth, and as soon as she got her wits about her, cried out for and displayed her profound desire for such association, love and affection. This case bears absolutely no resemblance to In re Adoption of D———, or to Miller v. Miller, cited in the dissent but not urged in respondent's brief.[10] This case presents the saddest kind of case that confronts our Court. Without knowing who presently have the baby, we are sure they will be heartsick upon reading this decision. However, the natural mother equally or more so may be heartsick if we decided otherwise.

We are of the sincere belief that the judgment of the trial court should be reversed in this case, that the judgment be vacated and all those having anything to do

---

9. See also Adoption Capparelli, 180 Or. 41, 175 P.2d 153 (1946).

10. The facts in that case make it obvious why the trial court would not permit a revocation after nine days. A consent was signed by M on condition he would receive $160 cash and release of a lien impressed by the trial court in the divorce action upon his savings account amounting to $5,067. This was to be accomplished in 5 days, but for some undisclosed reason was not forthcoming until later. On the ninth day after the agreement M went to court to revoke his consent. The trial court should not have permitted the agreement in the first place, since it placed a young child on an auction block, where its flesh and blood and natural rights became quid pro quo, in the market overt. These facts alone should be sufficient to have precluded M. After his petition to revoke the consent, M accepted the $160 cash and a release of the lien, but to the date of his argument in

this Court, had not offered to return the $160 or reinstate the lien. This man had five lawyers in the pursuit of his objective to get out from under his parental duty to support his minor child, all of whom were either dismissed or withdrew. Upshot was that M argued his own case in this Court after losing his last attorney, in which he virtually accused his ex-wife of homicide, admitted, upon question put to him by one of the justices, that the only ground upon which he sought revocation of his consent, was that the money and the lien release were *not accomplished within five days*, and in response to another question by one of the justices, i. e., "Did you have an intent to go along with that agreement?" M answered, "*I did for five days.*" The justice who wrote the opinion simply said, "Good cause for setting aside or withdrawing the consent to adoption not having been shown, the order of the District Court is affirmed."

with the custody of this child be ordered to restore such custody to the appellant herein, and it is so ordered.

CALLISTER, J., concurs.

TUCKETT, Justice (concurring).

I concur, but wish to observe, in addition, that under the facts of this case it appears to the writer that the social worker for the placement agency was too hasty in her efforts to obtain the plaintiff's consent to the adoption. I am of the opinion that the plaintiff should have been let alone for a reasonable period of time to consider the difficult and important problem of abandoning her child to the care of others.

ELLETT, Justice (dissenting).

I dissent.

The decision speculates upon the morality of the petitioner and how by one tiny slip she became pregnant. No one is accusing her of flagrant promiscuity. The issues in this case do not touch upon the circumstances under which she became pregnant. It seems to me that there are two issues which confront us in this matter: 1. Did the plaintiff knowingly and voluntarily give her consent to a child-placing agency for the adoption of her baby? 2. Can a parent who has legally given consent withdraw the same as a matter of right prior to final adoption?

The prevailing opinion makes much of the fact that the brother upon whom the plaintiff relied for counsel when she first discovered her peril advised her to leave town and to place her baby for adoption. It would be difficult to see how better advice could be given to her. Through her brother she contacted her local priest, who advised her that if she wished him to, he would contact a priest in Salt Lake City to advise with her. For reasons of her own, she did not contact the Salt Lake City priest, but instead came to Salt Lake City and contacted a doctor whom she had previously known. This doctor gave her the same good advice which her brother had given her regarding the placing of her child for adoption and talked to her on at least 10 occasions about the matter.

Some mention is made of religious backgrounds, but I can see nothing pertinent in discussing that, as we are not informed as to whether or not the child was placed in a home of the same religious affiliation as that possessed by the plaintiff herein. However, it is well known that social workers undertake to place children in homes of adopting parents whose religion is compatible with that of the mother. There also seems a good reason why the plaintiff would not have gone to the child-placing agency of her own religion and friends if she wanted to keep the matter a secret.

The social worker who talked to the plaintiff before the child was born and who secured her signature after the child was born gave the same good advice to her that

her brother and her physician had given her, that is, to place the child for adoption, where it would have a name and security, and not try to raise it herself.

The prevailing opinion cites advice given the appellant by those who love her, by those whose professional duty it is to assist her, and by those who devote their time and attention in trying to relieve unwed mothers from the worry attendant upon situations such as that in which the appellant found herself, all to the same effect, and then the opinion labels such advice as something immoral, indecent, and bearing upon the idea of undue influence.

The author of the main opinion turns juror and after reading the record three times states, "Frankly, I don't believe she read anything contained in the so-called consent except a blank line which someone pointed out for her signature. If she did read it she was out on cloud nine and did not understand it." The judge who heard the testimony of the witnesses found to the contrary and based his findings upon testimony that amply supported such findings. The belief of the author of the main opinion that plaintiff was out on cloud nine and did not understand what she read should not be determinative of this matter. Her own doctor testified that the effects of the medicine he gave her would have worn off prior to the time she signed the consent to adopt.

Opposed to the testimony of her doctor was the testimony of an expert, a professor of psychiatry, and who never saw the plaintiff prior to the day before he testified. He stated that it was his opinion that if what the brother and sister of the plaintiff said was true about her being confused, then it would be his opinion that there would be some lack of understanding on her part at the time when she signed the document.

The trial judge, under all of the testimony given him, decided that the plaintiff knew what she was doing when she signed the consent to adopt. This finding is bolstered by the further fact that she had had several months to plan to do the very thing which she did do, and I think it is an unwarranted presumption for this court to adopt a finding contrary to that found by the trial judge under the evidence as presented to him.

The opinion cites cases to the effect that a consent may be withdrawn before final adoption, but the cases cited do not support that conclusion as it applies to this case.

Let us look first at the case of Taylor v. Waddoups, 121 Utah 279, 241 P.2d 157, which is relied upon as recognizing the right of a natural parent to revoke a written consent. The only place such idea appears in that case is in the lonely dissent of Mr. Justice Henriod. The case was decided on the ground that a written consent not given to a licensed child-placing agency is no consent at all unless given in open court. Since the consent given in that case was between the natural parent and the adopting parents, the court held that it was no consent at all

and, therefore, there was nothing that needed to be revoked.

Another case cited is that of State ex rel. Platzer v. Beardsley, 149 Minn. 435, 183 N.W. 956. It is claimed that this case allows a parent to revoke consent. However, under Minnesota law a written agreement creates no binding obligation respecting the custody of the child. See State ex rel. Anderson v. Anderson, 89 Minn. 198, 94 N.W. 681; State ex rel. Rennings v. Armstrong, 141 Minn. 47, 169 N.W. 249; State ex rel. Machgan v. Pelowski, 145 Minn. 383, 177 N.W. 627. The question involved in the Platzer case was the welfare of the child. The hearing on appeal under Minnesota law was a trial de novo (Section 8312 G.S.1913), and the Supreme Court lamented the fact that the matter had been tried on stipulation of facts instead of upon evidence.

Another case which the main opinion relies upon as giving a natural parent the right to revoke consent is that of Combs v. Edmiston, 216 Ark. 270, 225 S.W.2d 26. The statutes of Arkansas require the court to find that adoption would be for the best interest of the child before granting the decree. The trial court found "that it would be to the best interest of both the child and the appellants [adopting parents] to deny the adoption." The Arkansas law also required that the court find that "there is proper consent" at the time a temporary order is made. Since consent was withdrawn before a temporary order was made,

the court had to deny the adoption for that reason also.

Another case relied upon is that of Green v. Paul, 212 La. 337, 31 So.2d 819. In Louisiana consent of natural parents to the adoption must be continued until the final decree of adoption is given; and since in that case consent had been withdrawn prior to hearing, of course, the court was unable to grant the adoption.

If it be decided that a parent can revoke a consent at any time before final adoption, great mischief will be done to the efforts made by child-placing agencies and to parents who wish to adopt children. It is not conducive to a good relationship for parents to be on tenterhooks for a year or more, fearing to bestow their love and affection upon the baby lest they have it all snatched away by a natural parent who may have a change of mind. Such a holding would really open the door to a shakedown in case the adoptive parents let their natural love go to the child, for they would pay any sum possible to retain *their* child. If, on the other hand, they kept the child as a boarder until final adoption was had, the child would not be able to receive the love and affection which it so much needs for its proper development in the beginning of its life.

In the case of Miller v. Miller, 8 Utah 2d 290, 333 P.2d 945, this Court had before it a request to withdraw an agreement to adopt. In that case the appellant was divorced from his wife, who had married another

man. He agreed to permit the stepfather to adopt his child on certain conditions which would terminate his duties regarding the support of the child. The father undertook to set aside and revoke his agreement to adopt nine days after he had signed the same. The court made and entered its order denying the motion to set aside the agreement and determined that the best interest and welfare of the child would be served by the enforcement of the agreement and the completion of the adoption.

Whether the Miller case involved a shakedown or not is immaterial, for up until the present time the appellate courts have not tried to tailor the law to fit particular cases, and in that case this court held that consent given could not be set aside at the election of the natural parent.

It may be that the plaintiff herein would be able to provide the temporal needs of the child, although the great worry which she had prior to its delivery was how she was going to pay the expenses connected with the birth of the child, and there is nothing in the record to show that she has ever paid those bills. A child, however, is entitled to more out of life than simply to be fed and clothed. Every child is entitled to have a status in life which will not be a millstone around its neck. While as a matter of justice and right there should be no such thing as an illegitimate child, as such child has done nothing wrong, and the term "illegitimate" should apply to its parents, neverthe-

less as a matter of fact a child born out of wedlock is stigmatized with the term "bastard" and is handicapped socially and deprived of the love, affection, guidance, and counsel of a father.

The record shows that the child is now placed in the home of a professional man and that it is a good home.

The statements made by judges over the past hundreds of years to the effect that a child is better off with a natural parent than an adoptive parent are simply not always borne out by the facts. The love and affection existing between many adopted children and their adoptive parents are just as deep and just as real as is that which exists between natural parents and natural children. I am not persuaded that the rule adopted by Solomon in his ruse to determine the true parent of the child given him by the two women would be a test that would stand up under modern-day conditions. The record of the number of times juvenile courts have been compelled to deprive parents of their children because of neglect and cruelty and to place the children in suitable homes is evidence of the fact that love and affection often exists in the hearts of those who wish children more so than in the hearts of those who have an unwanted child.

While it may be true that this appellant in her loneliness could find love, affection, and satisfaction out of having a child that she could raise, nevertheless the child itself

would not find that love and affection to be different from that which comes from its adoptive parents. I would think that any mother who has the love of her child at heart to the extent that the true mother had in the case of Solomon's dilemma, not only would not insist upon a division of the child but would say to the adoptive parents who could give the child a name, security, and honor in the community, "Here. You take the child."

I would affirm the judgment of the district court.

CROCKETT, Chief Justice (dissenting).

With deference to the opinions of my colleagues, which I think show a commendable intensity of concern in this case, and notwithstanding the already rather full treatment therein, there are some aspects of the issues involved upon which I desire to set forth my own ideas. The multifarious complexities and uncertainties of a human life are such that I say in sincerity that I have no firm conviction that I am wise enough to have absolute prescience as to the direction in which the welfare and happiness of this child will best be served. But the several considerations stated below incline me to believe that the judgment of the trial court should be sustained and I therefore concur in dissenting with Justice ELLETT.

1. As to desirability of giving protection and assurance to prospective adoptive parents, see statement in Jacob v. State, 7 Utah 2d 304, 306, 323 P.2d 720.

Since time immemorial for various reasons there have been children left without a home or parents. It is a credit to the race of man and to civilized society that a substitute means is usually found to supply this vital need. To do this it is essential that there exist in the law an orderly, efficient and binding method of placement, which is as practical and available as possible to those concerned.[1] The benefits to the homeless child, to the relinquishing parent when there is one, to those willing to take the child as their own, and to society itself, are so obvious that mention without elaboration is sufficient for my purpose here.

This Court on numerous occasions has stated, and other courts invariably affirm, that where custody of a child is in issue the matter of paramount concern should be the welfare and happiness of the child.[2] This meets accord in my thinking for numerous reasons, including the fact that usually, as here, there is an innocent baby who has become a pawn between the tensions that have arisen in a dispute between adults. A fact which seems to argue quite persuasively in support of the trial court's determination is that in my experience of many years as a lawyer and judge it·is my observation that social workers and social scientists who have had both education and practical ex-

2. See In Re Adoption of D_____, cited in main opinion.

perience in such matters uniformly agree that in most cases the wise course for an unwed mother is to place the child for adoption.[3] Consistent with this and of significant import in this case is the fact that each of the persons in whom petitioner appeared to have confidence and sought counsel, including those who should have, and I suppose did have, both interest in and love for her, advised her that in their judgment the wise course was to place the baby for adoption.

I readily agree that the foregoing does not deprive petitioner of her rights as the mother of the child, nor of the right to make the decision for herself. The observation made by Justice TUCKETT that the release and consent in this case was taken too quickly is not entirely without merit. Hindsight now shows plainly that it is indeed unfortunate that under the particular circumstances shown it was done so hastily as to allow a question to be raised as to whether petitioner had sufficient opportunity to make that decision for herself after the baby was born. Whether she did so is in my mind the critical issue of fact in this case.

But it has been decided after a plenary trial and by the proper authority.

The release and consent having been executed in the form and in the manner authorized by law should stand protected by certain principles. It is presumed to be valid and should not be rescinded unless overcome by proof that the petitioner was acting under some form of duress or undue influence, or a combination of them, so that signing it was not her free and voluntary act.[4] To overcome such a written instrument should require clear and convincing evidence.[5] Whether that degree of proof was met is for the trial court to determine.[6] Consideration should be given to the advantaged position of the trial court in judging the credibility of witnesses and in fact in determining all of the issues in the case.[7] I trust that I am correct in assuming that the majority believe that the evidence does so preponderate against his finding and that they have concluded that the appellant did not voluntarily sign the release and consent. In that connection at the risk of being unduly repetitious, I summarize some facts which impress me as giving adequate support to the trial court's determination.

3. The Child Welfare League of America, Standards for Services to Unmarried Parents, published 1960, Sec. 3.5, page 18; Adoption, Viola W. Bernard, M.D., published 1964 by Child Welfare League of America, Inc., page 73; The Child Welfare League of America, Standards for Adoption Services, page 4.
4. See discussion of duress in Thomas v. Children's Aid Society of Ogden, 12 Utah 2d 235, 364 P.2d 1029.

5. Jardine v. Archibald, 3 Utah 2d 88, 279 P.2d 454.
6. See Child v. Child, 8 Utah 2d 261, 332 P.2d 981.
7. See statement in Nokes v. Continental Min. & Mill. Co., 6 Utah 2d 177, 308 P. 2d 954.

The appellant is not the usual immature young girl who finds herself pregnant. She is of mature years, age 34, she is employed and no question is raised as to her competency to make up her own mind. She had from the time she learned she was pregnant to decide what to do. She undoubtedly did a great deal of thinking about it and had ample opportunity and did consult with others including her brother and sister. She appears to have arrived at a decision by September, about three months before the baby was born. The signing of the release about 24 hours after that event indicates that she was still of the same mind.

At this point it is of vital importance to note that the evidence is in conflict as to her degree of awareness and alertness at the critical time of signing the release and consent. Her doctor who observed her during the day says that the dosage of Demerol given at 9:40 in the morning would have worn off within two hours. This would have been a minimum of about four hours before the release was signed and he was of the opinion that she was fully competent to sign it. This was fully supported by the testimony of Mrs. Stewart who presented the release to her for signature. I cannot understand how it can be concluded that the trial court did not have the prerogative of believing these witnesses. Further corroborating the idea that she knew what she was signing and did so voluntarily is the fact that she was still of the same mind three days later when she signed the consent that the hospital release the baby. This completed the relinquishment.

I certainly do not desire to minimize the ordeal which the combination of emotional distress and physical suffering must have been for this young woman, nor to fail to sympathize with her plight after she underwent a change of heart and desired to get the baby back. My heartfelt wish is that there were two babies so that the void which must exist on one side of the case or the other could be filled. There is some consolation in realizing that, just as in the laws of physics, "nature abhors a vacuum," and fills it up; so it is with human emotions. The void will be filled some way, and that if time does not completely heal, it surely will assuage the wounds. But as earlier indicated herein, there are considerations which transcend concern for the adults affected. It appears to have been considered judgment of those who should know the most about the matter, that the best prospect for a well adjusted and happy life for this little child would exist by sustaining the release and not undoing that which has been done. Additionally, this would reinforce rather than to tend to upset the orderly processes of law by which such social ills are treated.

On the basis of the considerations discussed above it is my opinion that the judgment of the trial court should be affirmed.