George SIEBERT et ux *v.* Josephine BENSON, Next Friend of Mark Edward Gann

5-4348                                422 S. W. 2d 683

Opinion delivered January 15, 1968

844

*William I. Purifoy* and *C. T. Bennett,* for appellants.

*W. B. Howard* and *Jack Segars,* for appellee.

LYLE BROWN, Justice. We are here concerned with the custody of a four-year-old boy, Mark Edward Gann. The Sieberts, appellants here, obtained an interlocutory order of adoption. Mark's mother (who had abandoned the child at birth) entered her appearance in that proceeding and gave her consent. However, Josephine Benson, appellee, with whom Mark had resided continuously since birth, was not a party to the proceeding. A few weeks after the adoption Mrs. Benson intervened in the probate court proceedings in protest. At the same time, she filed a petition for a writ of habeas corpus in the Chancery Court to regain immediate custody of Mark. Hon. Gene Bradley, as judge of the Probate Court and as judge of the Chancery Court, consolidated Mrs. Benson's intervention and petition for writ of habeas corpus for trial purposes. The interlocutory order of adoption was set aside on jurisdictional grounds. Mrs. Benson was awarded custody of the child in the habeas corpus proceedings. The Sieberts have appealed from both orders.

Mark was born to Margaret Gann on January 13, 1963. She had been separated from her husband for the previous five years, although they lived in rather close proximity in Sharp County. During the latter stages of

her pregnancy Margaret became ill, apparently from lack of medical attention. Mrs. Josephine Benson, who lived a few miles from Margaret, learned of Margaret's condition and went to her aid. Mrs. Benson regularly received a government pension as a war widow; she received monthly payments from the sale of a farm; and she owned a home located on twenty-five acres on which she gardened and raised a modest amount of stock. Mrs. Benson obtained for Margaret immediate and competent medical attention at Imboden and Mark was born there in a medical clinic. All expenses were paid by Mrs. Benson.

Margaret related to Mrs. Benson that the child was illegitimate; that she had the burden of two other children; and that she would not be able to properly care for the new baby. In her sense of gratitude to Mrs. Benson, who was without children at home, Margaret insisted that Mrs. Benson take the child as her own. She accepted the child and took it to her home on the day it was born. As soon as Margaret was able to travel she left for California and has since resided there. Mrs. Benson has once visited Margaret, taking Mark with her. The two women have corresponded intermittently since Mark's birth.

Mrs. Benson has a married daughter residing in Memphis. In traveling from Sharp County to Memphis to visit her daughter, Mrs. Benson would travel through Jonesboro. There the Sieberts operated a nursery. On a return trip from Memphis late in October 1966, Mrs. Benson stopped at the nursery and purchased some fruit trees. Mr. Siebert was attracted to Mark and gave him a soda. The foursome—Mr. and Mrs. Siebert, Mrs. Benson, and Mark—had a visit of some two hours. The Sieberts have six children, all girls. Their ultramodern home is located at the nursery. In the course of the visit Mrs. Benson related Mark's history. There was conversation about the possibility of the Sieberts adopting Mark. The Sieberts testified Mrs. Benson was agreeable; Mrs. Benson denied it. She did agree that Mark could

spend the night with the Sieberts. Mrs. Benson continued to her home in Sharp County and stayed overnight. There she picked up a pony trailer and returned for Mark. They proceeded to Memphis to get the child's pony.

The next day Mr. and Mrs. Siebert, after talking with their attorney, proceeded to Sharp County. There they obtained the name and address of Mark's mother in California. A waiver and entry of appearance was mailed her. When executed and returned, the instrument was to be filed in adoption proceedings in the Probate Court of Craighead County. Instead of returning the instrument to Sieberts' attorney, Margaret Gann wrote Mrs. Benson that some parties in Jonesboro were trying to adopt Mark.

When an immediate reply was not received by the Sieberts, they contacted Margaret by telephone in California. As a result of that conversation Mr. Siebert wired her the funds to fly to Memphis. There the Sieberts met her and brought her to Jonesboro by automobile. She was agreeable to the adoption and executed the entry of appearance. That was November 3, 1966. On that same day Mrs. Benson and Mark were enroute from Memphis to their home in Sharp County. As soon as Margaret Gann agreed to the adoption, Siebert scurried to Sharp County, expecting to find Mark and return him to Jonesboro, Craighead County, where the adoption petition was to be filed the next day.

Mr. Siebert met Mrs. Benson and her foster child on the highway near Hoxie, Lawrence County, and hailed them. Siebert explained that they were having a children's party at the school that night; that he would like very much to take Mark to the party; that Mark could spend the night with the Sieberts and they would return him to Mrs. Benson the next day. He did not mention the adoption proceedings. Nor did he relate that Mark's mother had been flown in from California. It

was under those circumstances that Mrs. Benson permitted Mark to return with Siebert.

When Mrs. Benson completed her journey home, she found the letter Margaret Gann had written her from California, advising that someone in Jonesboro was trying to adopt the child. Mrs. Benson immediately set out for Jonesboro to get Mark. She first went to the school and found there was no party; she called the sheriff but she had no papers and he could be of no help; she rushed to the Siebert home; admittance was refused her; she forced a locked door, along with the doorframe, and entered; an altercation ensued; the sheriff was called; Mrs. Benson was advised that Mark's mother had signed adoption papers and that she had best go home. To that request she conformed. It was past midnight.

Mrs. Benson returned to Jonesboro the next day. She interviewed the sheriff, an attorney, and a Catholic priest, all without success. While she was so engaged, the parties to the adoption were on their way to Blytheville, some fifty miles away, to present the adoption papers to the probate judge. The adoption was granted. Mrs. Benson had no knowledge of those proceedings.

Except for the Sieberts-Benson conversation about adoption, the facts we have thus far digested from a voluminous record may be said to be uncontroverted. The other pertinent facts relate to (1) Mrs. Benson's execution, in the afternoon of November 4, of a "settlement" document which purported to give her consent to the adoption; and (2) the alleged unfitness of Mrs. Benson as the custodian of the child. Those matters are highly controverted. Some twenty witnesses testified and it is apparent that a number of them had opinionated feelings.

(1) *Mrs. Benson's Execution of the "Settlement" Document.* Her interviews with others having proved

fruitless, Mrs. Benson went to the office of Siebert's attorney, who had returned from the trip to Blytheville. There she reiterated her protest about the child being taken away from her. The attorney apprised her of the interlocutory order, showed her Margaret Gann's signature on the waiver, and advised her that in his opinion she could not regain possession of the child. Mrs. Benson explained her expenditures on the mother during and preceding Mark's birth and indicated that she should be reimbursed. After conferring by telephone with Siebert, the attorney gave Mrs. Benson a check for $500. The attorney says she broached the subject of money; Mrs. Benson says the attorney suggested it. She executed an affidavit acknowledging receipt of the money and stated that she consented to the adoption which had already been granted.

The two witnesses disagree as to the purpose of Mrs. Benson's trip to the attorney's office.[1] The attorney says it was primarily to obtain reimbursement. "She was obviously moved and she cried some while in my office." However, he quoted her as saying she thought the adoption was the best for Mark. Then, so he says, she broached the subject of reimbursement. The substance of Mrs. Benson's extended testimony in that regard is that she had been completely frustrated in two hectic days of fruitless efforts; that she was exhausted, crying, and "so upset I couldn't read" the affidavit; and that she would not have signed it except for the attorney's assuring her that the adoption was completed and legal. (When Mrs. Benson filed her petitions she authorized her attorney to return the $500.)

In his oral opinion the trial judge stated that he accepted Mrs. Benson's explanation "as to why she received the money." It should be added that a consent to adoption may, under proper circumstances, be with-

---

[1] That attorney withdrew from further participation as the Sieberts' attorney, presumably because he was to become a key witness in the resistance of Mrs. Benson's intervention.

drawn before the final order. *Martin* v. *Ford,* 224 Ark. 993, 277 S. W. 2d 842 (1955).

(2) *The Fitness of Mrs. Benson to Have Custody of the Child.* The Sieberts produced testimony that on at least three occasions Mrs. Benson initiated suggestions of adoption. Those statements were allegedly made to the Sieberts, Bob DePriest, and Mrs. Honeycutt (Mark's grandmother). Mrs. Benson denied having made any such suggestions. Mrs. Honeycutt's testimony drips with prejudice. Mr. DePriest stated that the child was permitted to spend a few days in his home; at the end of three days Mrs. Benson came after him; adoption was discussed and Mrs. Benson declared she could not give up the boy.

Mrs. Honeycutt and Mrs. Gresike (Mrs. Honeycutt's employer) charged Mrs. Benson with the use of vulgarity and with "boarding men friends." Each also testified as to an occasion when Mrs. Benson appeared to be under the influence of drugs or alcohol. Another testified as to Mrs. Benson's irregularity in church attendance. Another witness from the Bureau of Vital Statistics produced records to show that Mrs. Benson had attempted to obtain a birth certificate for Mark and listed herself as the mother of the child.

Mrs. Benson called three neighbors as witnesses. They described her as a hard worker, a good housekeeper, attentive to Mark's needs, and of good behavior. It was testified that different men did, at various times, work for, and board with, Mrs. Benson. The neighbors saw no acts of misconduct.

The trial court described the attack on Mrs. Benson's character as being based on "more or less innuendo." The court commented on the absence of any testimony to show that Mark "was ever exposed to any immoral matters."

So much for the facts. The trial consumed several days and a four-hundred page transcript was accumulated. We have recited only those facts which are considered essential to an understanding and resolution of the issues. We now turn to particular rulings of the trial court, the three points advanced for reversal, and to a brief comment on one point raised by appellee.

1. The Sieberts contend the trial court should not have set aside the interlocutory order of adoption on jurisdictional grounds. The petition was filed November 4, 1966, and the order was entered on the same day. The probate judge held that on the date the petition was granted (a) the trial court had no jurisdiction over the presumptive father, Franklin Gann, Jr., and (b) Mrs. Benson, who stood in loco parentis to the child, was not made a party, nor did she enter her appearance and give consent.

Ark. Stat. Ann. § 56-103 (1947) requires the petition for adoption to state the name of the person having custody of the one to be adopted. Mrs. Benson had physical custody of Mark from the day of his birth until the day before the petition for adoption was filed. That fact was well known to the Sieberts. They did not disclose it to the court. They gained possession of the child through concealment of a vital fact, namely that it was being obtained for the purpose of instituting adoption proceedings the following day. We hold that Mrs. Benson's custody should have been revealed to the court and that she was entitled to notice. This court has held that one having custody of a child is so entitled. *Miller v. Younger*, 222 Ark. 663, 262 S. W. 2d 146 (1953). Although Mrs. Benson surrendered possession temporarily and under a concealment of fact, equity dictates that the manner of gaining possession should not sever her custody.

When the child was born, Margaret Gann had for seven years been the lawful wife of Franklin Gann. It

is true they had been separated for some five years, living, however, in close proximity. The trial court found that the fact of separation did not destroy the strong legal presumption that Gann fathered this child. *Thomas* v. *Barnett,* 228 Ark. 658, 310 S. W. 2d 248 (1958). No competent proof of non-access appears in the record.

True it is that the interlocutory order of adoption recites that the child is illegitimate. However, the marriage status of Margaret and Franklin Gann was not made known to the court until the second hearing.

Summarizing, the trial court found that as of the date of the interlocutory order, Mrs. Benson stood in loco parentis, and that Gann was in law presumed to be the father of the child, making them necessary parties to the suit; and that their absence from the suit voided his jurisdiction. Since we conclude that Mrs. Benson was a necessary party to the proceedings, we do not reach the propriety of the ruling with respect to the presumptive father.

2. Appellants contend the chancery court erred in assuming jurisdiction of the habeas corpus proceeding. At the time Mrs. Benson applied for the writ of habeas corpus, the adoption proceedings were pending in the probate court and that forum, say appellants, could have afforded Mrs. Benson adequate relief.

A collateral attack upon an order of adoption, made by petition for writ of habeas corpus, is permissible. It is available to one in interest who was not made a party to the adoption proceedings. However, in the habeas corpus proceeding, the only appropriate inquiry is whether the probate court had jurisdiction to enter the order of adoption. *Hughes* v. *Cain,* 210 Ark. 476, 196 S. W. 2d 758 (1946).

Mrs. Benson had a clear right, by habeas corpus proceeding, to go into chancery court and seek to regain

custody of the child which had been spirited away from her possession. The proceeding in probate was primarily one concerning *adoption*. It may well be that the probate court, in setting aside the adoption proceedings, *might* have eventually awarded some type of custody to Mrs. Benson. Yet the proceeding most certain to give her immediate custody of the child was habeas corpus. It is an extraordinary writ which demands the child be forthwith produced. The hearing is given priority. The identical procedure was followed in *A.* v. *B.*, 217 Ark. 844, 233 S. W. 2d 629 (1950).

3. Appellants contend that the award of custody to Mrs. Benson was contrary to the greater weight of the evidence; that the court has placed the child in custody of one totally unfit to be so entrusted; and that the record clearly shows the best interest of the child would be served by placing him in the custody of Mr. and Mrs. Siebert.

While it is axiomatic in custody cases that the welfare of the child is of prime importance, there are other considerations. Of one of those conditions, Justice Eakin had this to say in *Verser* v. *Ford,* 37 Ark. 27 (1881):

> "It is one of the cardinal principles of nature and of law that, as against strangers, the father, however poor and humble, if able to support the child in his own style of life, and of good moral character, cannot, without the most shocking injustice, be deprived of the privilege by any one whatever, however brilliant the advantage he may offer. It is not enough to consider the interests of the child alone."

As a foster mother, Mrs. Benson is in the category of being the only parent Mark Edward Gann has ever known; the Sieberts are in the category of strangers. The mutual love that exists between Mrs. Benson and Mark is not questioned. To the contrary, the record is

replete with evidence of their mutual devotion and constant companionship. Mrs. Benson called up sufficient physical strength to bodily knock in a locked door and its facing, which stood between her and the child she had nurtured from birth. Only love could have given her that extra strength.

Is Mrs. Benson morally fit to have the custody of Mark? The trial court answered that question in the affirmative. We are unable to say that he abused his discretion. As recited, the evidence was highly conflicting. Some twenty witnesses testified and it is apparent that some of the key witnesses had preconceived opinions. In cases so fiercely contested the vantage point of the chancellor becomes all the more apparent. In no situation could the personal observations and judgment of the trial court be more valuable.

Appellee questions the right of the Sieberts to appeal from an order setting aside an interlocutory decree of adoption. Ark. Stat. Ann. § 56-111 (1947) is cited. The answer is that the Sieberts did not appeal from an interlocutory order but from a final order of January 12, 1967. That order was a final decree denying the prayer for adoption on the ground of lack of jurisdiction.

Affirmed.