In re Adoption of D————.

No. 7864.    Decided January 9, 1953.    (252 P. 2d 223.)

526

See 2 C. J. S., Adoption of Children, sec. 21. Withdrawal of consent to adoption. 1 Am. Jur., Adoption of Children, sec. 72; 156 A. L. R. 1011.

*Benjamin Spence,* Salt Lake City, for appellant.

*Young, Young & Sorenson,* Provo, for respondent.

CROCKETT, Justice.

After contested trial, the district court granted respondents a decree of adoption of the minor above referred to and denied the claims of appellant, the child's natural mother. She appeals. Affirmed.

This question is presented: Does a parent who has appeared before a court in connection with an adoption proceeding and voluntarily consented to the adoption of her child, have the right, arbitrarily and without cause, to revoke that consent, when as here, the adoptive parents have accepted the child, kept it in their home for a considerable period of time so that mutual affections have developed, gone to trouble and expense in providing care and in making a home for said child and have in all respects satisfied the requirements of the law as to adoptive parents? Our answer is that under those circumstances she has no such arbitrary right.

The child D——was born April 28, 1948, so is now 4 years 9 months old. She was placed with respondents over two years ago (in December of 1950) by her maternal great-

grandmother who had been trying to care for her, but felt unable to continue doing so. A brief review of the antecedents to the placement of this child with respondents seems appropriate.

Appellant was herself a victim of unfortunate home circumstances. She had no acquaintance with her father; her mother died when she was six and she thereafter lived with her grandmother with whom she did not get along very well. She married at 17; lived with her husband but intermittently until the child, D———, was born, but within three weeks therafter he deserted them for good.

Right after the child's birth, appellant took her to her grandmother's who cared for D——— until December, 1950 when she was placed in respondent's home. The basis of this decision being what it is, it is unnecessary to delineate herein the details concerning appellant's conduct and lack of interest in this child. Her grandmother, her aunts and others all advised her that she should either take an interest in D———, give her a mother's love and the care and attention she should have or let someone adopt her because her grandmother, well up in her sixties and in poor health, was neither physically nor economically able to continue giving the child a home and care. Nevertheless, the situation did not change, which finally caused the grandmother to arrange to place D——— with the respondents, promising them that she would do everything she could to help them adopt her. That is the basis upon which they accepted her, assuming full responsibility for her care and not expecting compensation from anyone.

The child D——— was then in poor health; she was very thin; suffering from mastoid trouble; had a heart murmur and her feet were turning in. Respondents procured special medical and other care for her which has greatly improved these conditions and her general health. They have provided a room of her own, child's play facilities and otherwise made a comfortable, attractive and proper home for

her. Within a month after the placement respondents' attorney, Mr. Dallas H. Young, brought appellant to the home; she was assured she could visit D——— whenever she desired, but she did not do so.

It was necessary for the child to be in respondents' home for a full year before a decree of adoption could be granted.[1] Apparently looking to this, after she had been there ten months, that is in October, 1951, a petition for adoption was duly filed and appellant appeared before the district court, was questioned concerning her desires and voluntarily signed the consent to adoption. Meanwhile, because of delay in contacting the child's father, who was in Korea, the proceeding did not go through when the year was up in December as it might have done. (The father later gave consent in court.) It was not until fourteen months after the placement, or on February 8, 1952, appellant filed objections to the proposed adoption purporting to revoke the consent she had given. She claimed the right to do so on two grounds: (1) That she was the victim of "duress and undue influence" in signing the consent, and (2)

"that a parent of a minor child could withdraw her consent * * * at any time before the adoption, * * * even though it was obtained voluntarily and without undue influence, coercion or persuasion * * *." (quotes from her brief).

In considering the question of duress, we do not overlook the fact that often a natural parent, particularly a young mother left alone with the responsibility of a child, because of economic conditions or other circumstances, in order to avoid shame, embarrassment or hardship ■ to herself or others, or out of solicitude for the child, may be an easy prey to undue influence of designing or conniving persons. Therefore, whenever such a charge is made, the court should carefully scrutinize the evidence,

[1] 78-30-14, U. C. A. 1953.

lest an honest, worthy and well meaning natural parent be unjustly deprived of her child.[2]

However, in the instant case the evidence clearly manifests that the trial court was right in its findings that appellant was not a victim of duress or undue influence. She had many months to consider the matter. She had conferences with her grandmother and other relatives and with counsel for respondent, and thereafter voluntarily appeared before the court; she was questioned concerning her attitude and desires and freely signed the relinquishment and consent. Thus, even though this proceeding is equitable in the highest degree, and this court may review the evidence,[3] there is no basis for disturbing the trial court's finding.

That brings us to the question of importance and real interest in the case: the claimed arbitrary right to revoke the consent. Appellant cites no case where revocation has been allowed under facts analogous to the instant one, but places reliance principally upon generalities. We are referred to a text statement at 138 A. L. R. 1038 to the effect that the majority view is that the natural parent may withdraw the consent at any time before the adoption takes place. An analysis of the cases purporting to support that statement shows that it is much too broad. The key one of these cases is *In re White*[4]. It was submitted upon stipulated facts; the reasons for the revocation were not shown; the child had been out of the possession of the mother for only a relatively short period of time. The court recited:

"* * * that under the circumstances of this case, *no vested rights having intervened,* the natural mother had the right to withdraw her consent * * *."

[2] See statement of Chief Justice Wolfe, *Taylor* v. *Waddoups,* 121 Utah 279, 241 P. 2d 157.

[3] *Walton* v. *Coffman,* 110 Utah 1, 169 P. 2d 97, and cases cited therein.

[4] 300 Mich. 378, 1 N. W. 2d 579, 581, 138 A. L. R. 1039.

With respect to the case, the A. L. R. text further states:

"It has also been indicated that *intervening vested rights* on the part of the adopting parents or the child might preclude the natural parents from withdrawing consent and thus barring the adoption."[5] (Emphasis added.)

Four additional cases, representing three other states, are listed as supporting the proposition claimed by appellant.[6] Limitations of space dissuade us from discussing each herein, but none of them could properly be said to apply to the instant case in favor of appellant's position, nor do they justify the rule as contended for by her. Reading of many cases on this subject teaches that each depends upon its own facts: the circumstances of the placement of the child; those under which the consent was given; the length of time the adopting parents have had the child; any "vested rights" that have intervened; the welfare of the child; the conduct, as well as the character and ability of the respective claimants; these and the particular governing statute are all given consideration in determining whether the consent may be revoked.[7]

Illustrative of this is our own recent case of *Taylor* v. *Waddoups*[8] which appellant urges upon us as compelling a reversal of the trial court. Actually it is an excellent example of the error of her contention. This court did state that the natural mother, prior to the adoption, had effectively revoked any consent to the adoption, but as pointed out by Mr. Justice Henriod, the revocation was permitted, *"when applied to the facts of this case."* [241 P. 2d 161.] (Emphasis added.) The facts are greatly at variance with

---

[5]138 A. L. R., p. 1039.

[6]*Re Nelms*, 1929, 153 Wash. 242, 279 P. 748; *State ex rel. Platzer* v. *Beardsley*, 1921, 149 Minn. 435, 183 N. W. 956; *Re Anderson*, 1933, 189 Minn. 85, 248 N. W. 657; *Fitts* v. *Carpenter*, Tex. Civ. App., 1939, 124 S. W. 2d 420.

[7]See cases collated *In re Adoption of a Minor*, 79 U. S. App. D. C. 191, 144 F. 2d 644, 156 A. L. R. 1011; statement at 1012.

[8]See Note 2, supra.

those here. There the Welfare Department placed the children with the Waddoups as a paid boarding home. When the purported relinquishment was signed, the mother was up against an impossible situation, both economically and on account of her health; but the most important and controlling fact was that the purported consent was not executed before the court as required by statute, but was an attempt to execute a consent in a manner not authorized by law.

That the text statement relied upon by appellant, earlier referred to herein, cannot justifiably be said to support her contention is plainly demonstrated in a subsequent A. L. R. annotation on this subject.[9] The following observation expressed in that text appears to be an accurate appraisal of the adjudicated cases on this subject:

"While, as brought out in the earlier annotation, there is authority for the view that a natural parent's consent  *  *  *  may be effectively withdrawn  *  *  *  before the adoption has been finally approved  *  *  *  it must now be said, in view of the later cases  *  *  *  that the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption  *  *  *  and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, *the consent* is ordinarily binding  *  *  *  and *cannot be arbitrarily* withdrawn  *  *  *  particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a 'vested rights', have been forged between them and the child." (Emphasis added.)

This is certainly true of the more recent cases which analyze the situation in the broader social aspect and take what we regard to be the better and more enlightened view of the problem. As stated by Dean Pound:

"*  *  *  recent legislation and judicial decisions have changed the old attitude of law with respect to the dependent members of the

---

[9]156 A. L. R. 1011.

household. * * * Here also social interests are now chiefly regarded."[10]

The case reported in connection with the later A. L. R. annotation[11] contains an excellent and thoroughly documented treatment of the social implications underlying consents to adoption and their revocation. Although some emphasis is placed upon the wording of the District of Columbia statute, the reasoning and conclusion are in accord with those above expressed and adhered to in this opinion: that is, that the parents' consent, once voluntarily given, and acted upon by the adopting parents, could not be withdrawn without good cause.

The case just mentioned refers to *Wyness* v. *Crowley*[12] wherein the Supreme Judicial Court of Massachusetts declared:

"To accede to the contention that such voluntary consent [to adoption] may be withdrawn would be equivalent to saying that parties may come to a court, deliberately give their assent to actions by the court in matters affecting their interests, and afterwards, at their will and pleasure, return to the court and undo what they did because on a future day they did not like it," further remarking that the English courts do not permit such revocation, citing cases.

The Supreme Court of Kentucky takes a similar view, stating that where

"* * * the parent has agreed that his * * * child * * * might be adopted and has executed such consent * * * in the manner pointed out by the statutory regulations of the particular jurisdiction which has been acted on by the proposed adopter, then such consent or agreement, in the absence of fraud or duress in its procurement, plus the vastly increased opportunities of the adopted

[10]The Spirit of the Common Law, referred to by Mr. Justice Miller. See Note 11.

[11]*In re Adoption of a Minor*, 79 U. S. App. D. C. 191, 144 F. 2d 644, 156 A. L. R. 1001.

[12]292 Mass. 461, 198 N. E. 758, 759.

child, creates a case where there is no alternative but to sustain the adoption".[13]

Numerous authorities from other jurisdictions, which include so far as we have been able to discover all of the recent well considered cases, are in accord with this principle.[14]

One of the better cases on the subject is from our neighboring state of Nevada, *Ex parte Schultz*.[15] The court therein refers to four fundamental doctrines inherent in our ideas of justice, all of which militate against any arbitrary right of appellant to revoke her consent:

First, principles of contract require that where it has been represented to respondents, initially by the grandmother and later by appellant, that they could adopt the child if they would assume parental responsibility and take care of her, which offer they accepted, have performed, and are ready, willing and able to continue, prevent the arbitrary revocation of the contract The authorities uniformly discuss the agreement to adopt as a contract.[16]

[15]64 Nev. 264, 181 P. 2d 585.

[13]*Lee* v. *Thomas*, 297 Ky. 858, 181 S. W. 2d 457, 460.

[14]*A.* v. *B.*, 217 Ark. 844, 233 S. W. 2d 629; *Ex Parte Barents*, 99 Cal App. 2d 748, 222 P. 2d 488. California statute afterwards amended prohibiting revocation of consent except with court approval. *In re Adoption of Pitcher*, 103 Cal. App. 2d 859, 230 P. 2d 449, affirmed refusal of court to allow revocation under above statute. *Durden* v. *Johnson*, 194 Ga. 689, 22 S. E. 2d 514. *Application of Presler*, 171 Misc. 559, 13 N. Y. S. 2d 49. *In re Davison, Sur.*, 44 N. Y. S. 2d 763. *In re Adoption of Anonymous*, 101 N. Y. S. 2d 93, 198 Misc. 185. *Driggers* v. *Jolley*, 219 S. C. 31, 64 S. E. 2d 19. *Hammond* v. *Chadwick*, Tex. Civ. App., 199 S. W. 2d 547. *McRae* v. *Lamb*, Tex. Civ. App., 233 S. W. 2d 193. *Lane* v. *Pippin*, 110 W. Va. 357, 158 S. E. 673.

[16]1 Am. Jur. 629 et seq. Contracts to Adopt; 27 A. L. R. 1327; *Jones* v. *Guy*, 135 Tex. 398, 143 S. W. 2d 906, 142 A. L. R. 84; *Stanford* v. *Gray*, 42 Utah 228, 129 P. 423.

As we stated in *Stanford* v. *Gray* :[17]

"* * * * while contracts of this kind, fairly and voluntarily entered into, are valid as between the parties, they will not be enforced to the detriment of the child."

After acceptance such a contract is enforceable against the adopting parents and ought to be enforceable by them.

Second, estoppel and other principles of equity, under the circumstances, would preclude a court from assisting appellant to regain the custody of the child. The contention that no rights have intervened and no one has relied on the representation to his detriment shows a singular lack of understanding of human nature. It is confirmed by experience and common sense that when people who desire children, such as respondents, once fix their parental instincts and emotions upon a child which has been rejected and forsaken by others, they have great love, affection and concern for such child. There are those who maintain that under such circumstances the parental love and the desire to protect and care for the child is even more intense than in the case of natural parents. It would not be surprising that people who desire to adopt children may actually have greater affection for an adopted baby than a natural parent who might undesignedly or even by misadventure happen to become a parent to a child who may not have been particularly wanted and may present some unplanned for difficulties. Many parents who have had both natural and adopted children attest that it was impossible to make a distinction between the affection they have for the natural and the adopted children. Be that as it may, fortunately we are not called upon to deal with any problem of the perplexing nicety the one just posed would have.

A realistic appraisal of the situation compels us to recognize that persons such as respondents who have done what they have for this child, must be assumed to have an

[17]42 Utah 228, 129 P. 423, 426.

affection and attachment for her at least equally important to property rights. Viewed in that light, there certainly have intervened "vested rights" and respondents have, in reliance upon representations made, placed themselves in a different position, the undoing of which would cause them irreparable injury in the most real sense. Appellant not only stood by and knowingly permitted, but actually encouraged such circumstances to eventuate, and further formally executed the consent to adoption. Under such facts she should in equity and good conscience be estopped to reassert her rights to custody.

Third: The welfare of the child. That parents have the primary and superior right to the custody of their offspring above all others is not open to question; nor is it suggested that anyone may take a child away from a natural parent merely because he can offer the child better advantages than the natural parent could provide.[18] Nevertheless, when questions of child custody arise, the welfare of the child and her chances for a suitable home environment and advantages in nurture, training and education to the end that she may live and be conditioned for a well adjusted, happy and useful life are important factors to consider. In fact, it is often stated that such considerations are of the paramount importance.[19] However, this is modified by the presumption that the welfare of the child will best be subserved by being in the custody of its natural parent. In the case of *Walton* v. *Coffman*,[20] Mr. Justice Wade analyzes the antecedent cases of this court regarding contests over children and cogently sets forth this principle, but recognizes that the right of the natural parent may be surrendered or lost. When a parent has failed to give the child the attention and love normally to be expected, has abandoned its care to others, and by irresponsible conduct shown

[18]*Sherry* v. *Doyle*, 68 Utah 74, 249 P. 250; 48 A. L. R. 131.

[19]*Wallick* v. *Vance*, 76 Utah 209, 289 P. 103. *Jones* v. *Moore*, 61 Utah 383, 213 P. 191. *Hummel* v. *Parrish*, 43 Utah 373, 134 P. 898.

[20]Supra, Note 3.

an unwillingness or inability to measure up to parental responsibilities, these matters may be taken into consideration by the court in connection with other factors in determining the right to custody.

Fourth: Public policy favors the adoption of children who are left without parental refuge. Once a child has been cast adrift and is without responsible parental care, the policy of the law should be to assist in every way in establishing a satisfactory parent-child and family relationship. Adoptive parents should not be discouraged by a construction of the law which would cause them to fear the consequences of accepting a child because of the knowledge that the fate of their efforts would be at the will of the natural parent. As Mr. Justice Miller states:

"It is apparent that if in particular cases the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated." [79 U. S. App. D. C. 197, 144 F. 2d 650.]

He further points out the other potential bad effects, including the possibilities for racketeering, such interpretation of the law would put in reach of those who may be thus inclined, as well as lacking in he qualities of parenthood.[21] This is more especially so because in many instances the natural parent who has consented to adoption would already have demonstrated a certain degree of irresponsibility.

Recognition that such policy is sound and desirable undoubtedly motivated the Legislature, in connection with placement of children with agencies, to provide:[22]

"No parent * * * who by instrument of writing surrenders * * * the custody of a child to any children's aid society * * *

---

[21]See *In re Adoption of a Minor*, note 11, supra.
[22]Sec. 55-10-42, U. C. A. 1953.

shall thereafter  *  *  *  be entitled to custody or control  *  *  *
[of]  *  *  *  any such child  *  *  *"

and further, that when a release to a licensed agency has occurred, the

"court may order the adoption of any child, without notice to or consent  *  *  *  of the parent"[23]

thus apparently intending that the release to the agency is intended to be final. We are not here called upon to say whether under all circumstances this would prevent a revocation of a consent given to such an agency.

But release to an agency is certainly not the only way a parent can consent to his child's adoption. Our statutes clearly authorize that consents may be given in the presence of the court and with its approval in other cases. Sec. 73-30-4 requires consent of parents, provides certain exceptions, and says:

"provided, that the district court may order the adoption  *  *  * without notice  *  *  *  whenever it shall appear  *  *  *";

and Sec. 78-30-8 provides that the

"persons whose consent is necessary, must appear before the district court  *  *  *  and the necessary consent must thereupon be signed *  *  *."

Further statutory recognition that it is contemplated that the consent or the relinquishment of a child is in some instances to be with the approval of the court is found in the provision that no person shall relinquish a child,

"other than a relative  *  *  *  within the second degree  *  *  * unless specifically authorized  *  *  *  by and order  *  *  *  of court".[24]

---

[23]Sec. 78-30-4, U. C. A. 1953.
[24]Sec. 55-8-2(c), U. C. A. 1953.

No statutory provision specifically prohibits a change of mind and revocation by a parent who consents before a court. It is obviously unnecessary to so provide. These statutory provisions which authorize that consent be given in the presence of and with the approval of the court certainly contemplate that a consent so executed would be valid and binding. The court should ordinarily be as able to judge whether the consent should be given, and whether it is given voluntarily as an employee of these agencies and a consent given in court should certainly be as effective as the one given to the agency. It would be anomalous indeed if, as appellant contends, signing before an employee of the agency would have greater sanctity than one executed formally before the court in the adoption proceeding.

We do not lose sight of the fact that there is a distinction between cases under habeas corpus where the issue is merely as to the right of present custody and cases such as the instant one, where adoption is sought. Nevertheless, under the circumstances here shown, we believe that the action of the trial court conforms to the principles expressed in this opinion and that he correctly ruled that appellant could not revoke the consent she had given. This renders it unnecessary to consider the issue as to her fitness to have the child.

Other errors assigned are without merit. Judgment affirmed. Costs to respondents.

WOLFE, C. J., and McDONOUGH, HENRIOD and WADE, JJ., concur.