465 P.2d 541

**In re ADOPTION OF Baby Girl K_____.**

**No. 11690.**

Supreme Court of Utah.

Feb. 24, 1970.

Neslen & Mock, Kent Shearer, James R. Brown, Salt Lake City, for appellant.

Raymond S. Uno, Salt Lake City, amicus curiae.

ELLETT, Justice:

The respondent, an unmarried female, gave birth to a baby girl on November 2, 1968. On January 14, 1969, she appeared in the district court and pursuant to Section 78–30–8, U.C.A.1953 as amended, signed a consent before the Honorable Stewart M. Hanson, judge of said court, to permit the appellants to adopt her baby. That same day she surrendered custody of the child to appellants, who have had custody ever since.

On March 13, 1969, the respondent filed a petition and motion with the court to have the consent to adoption set aside and vacated and the care, custody, and control of the infant restored to her. She claimed that at the time she signed the consent, she was not aware of the nature and consequences of the act and was acting under undue influence, coercion and mistake.

The motion was heard by another judge who found that respondent knew and understood what was taking place when she signed the consent. There was no finding of undue influence, coercion, or mistake, and there was no evidence which would have supported such a finding. The consent was set aside apparently on the grounds that respondent was in a highly emotional state and that Judge Hanson had failed to read the consent to her before she signed it.

There is no provision of law requiring the judge to read the document to a parent. However, the statute, 78–30–8 supra, does require a commissioner to *explain the legal significance* of the consent when the parent or parents appear before a commissioner and not before a judge. In this case the lawyer had read the consent to the respondent, and Judge Hanson thoroughly explained the significance, meaning, and consequences of her signing the

document before she did so. In fact, she told the judge that she understood thoroughly and did not want him to ask her any more questions.

The appellants duly appealed from the judgment made, but the respondent has made no appearance and has not authorized anyone to appear for her. However, the Chief Justice of this court requested her lawyer below to appear and present her side of the matter by means of a letter and oral argument, and this request was honored.

■ The question before this court is this: Can a parent who voluntarily and knowingly gives consent for the adoption of a child and gives custody thereof to the adoptive parents thereafter have her consent set aside because she changes her mind? Ordinarily the answer is "No."

As a general rule it is held that parents have a superior right to the custody of their children, but the declared law has engrafted upon this concept another one of equal dignity, to wit, the welfare of the child. Based upon the latter consideration, statutes creating juvenile courts and procedures for depriving parents of their children have everywhere been held constitutional.

■ While the consent of a parent may be set aside for fraud, undue influence, and for good cause shown, still the court ought to consider carefully the welfare of the child in connection with what constitutes good cause. In this matter there was no finding of any fraud or undue influence on the part of the adoptive parents or of anyone else. True it is that at the time of giving her consent the respondent was emotional; but that is a condition to be expected of any mother when she gives up a child. Her consenting was voluntary and given with full knowledge of the consequences.

Judge Hanson, before whom the consent to adoption was signed, found the respondent to be in a highly emotional state but not unduly so. He said he had presided at approximately 1,000 adoption matters and was satisfied that the consent was freely given and that respondent knew and understood the consequences thereof.

After giving her consent in court, the respondent went to the University Hospital for a sedative. When she went home, she talked to a neighbor, who testified to the conversation as follows:

They had told me she had taken her to the hospital and so in talking to her she said, "I am glad I did it. I am glad I gave my baby up." She says, "I am happy now because I know my baby will be happy." And I'll have to say in her own words—I'll have to use one bad word or give you the initials for it or something. She said, "If my baby gets her little finger hurt she can now come running to her daddy and say, 'Daddy,

I hurt my little finger.'" And she said, "She will have a daddy to console her and nobody will be able to call her a little 'B.'" And I think you know what that stands for. And she says, "She will have a daddy and a mother." And she began to tell me the background as Mr. Brown [the attorney] had told her of this fine family and I told her, well, it took a lot of courage and now that she had done it that she had the best attitude she could take and she said, "Now, I am glad because I am going to try to make a new life for myself. I am going to try to study and after all I am young and I can get married again and I can really work hard because I know my baby will have a nice home and I know there is a future for me."

This conversation was had a short time after the respondent had signed the consent and at a time when she was not emotionally disturbed.

The law is set out in 2 Am.Jur.2d Adoption § 46 to be:

* * * [T]he trend of modern authority is toward the position that a parent who has freely and knowingly given the requisite consent to the adoption of his or her child cannot, after that consent has been acted upon by the adoptive parents by bringing adoption proceedings, withdraw that consent arbitrarily, or as of right so as to bar the court from decreeing adoption. * * *

The trial judge may have misunderstood the ruling of this court in the case of D. P. v. Social Service and Child Welfare Department, 19 Utah 2d 311, 431 P.2d 547 (1967). That case differs materially from the instant one in that the consent there was given within 24 hours of the birth of the child and while the mother was still in the hospital under sedation. The majority of this court also believed that she was unduly influenced in giving up her child. Besides, she did not appear in court to give her consent but gave it to an employee of a child-placing agency.

Agreements of adoption are merely contractual arrangements and are entitled to be enforced the same as are all other types of contract except as the welfare of the child might otherwise require. Because of the emotional disturbance naturally arising when a mother gives up her child, the law wisely provides that in cases such as this one, the mother must appear in open court where the judge explains to her the consequences of her consenting to the adoption; and we think that when consent is given in open court and before a judge, there is a presumption of regularity to it which does not necessarily attach to a consent privately given.

We think there is no basis in the record to justify the setting aside of the consent and that the trial court abused his discretion in that regard, and this belief

is strengthened by the fact that the respondent has made no effort to defend the order as made. The judgment is, therefore, reversed with directions to proceed with the adoption in the usual manner. No costs are awarded.

CROCKETT, C. J., and CALLISTER, TUCKETT and HENRIOD, JJ., concur.