488 P.2d 130

In the Matter of the ADOPTION OF F_____.

No. 12414.

Supreme Court of Utah.

Aug. 4, 1971.

Clyde, Mecham & Pratt, Elliott Lee Pratt, Salt Lake City, for appellant.

Don R. Petersen, Howard & Lewis, Provo, for respondent.

CROCKETT, Justice.

In anomalous contrast to the usual controversies over money or property, the opposing parties here are contesting for the right to incur an economic liability of many thousands of dollars.[1] That is, for something more precious to them: the right to the custody of a child. The dispute is between the natural mother, who relinquished her child for adoption shortly after his birth, and the parents who accepted the child for adoption. After a trial the district court made findings and rendered judgment in favor of the adoptive parents. The mother appeals.

From time when neither the memory nor the knowledge of man runneth to the contrary this type of controversy has been of the greatest difficulty and perplexity.[2] On the one hand, an unwed pregnant young woman, beset by various difficulties, including considerations of embarrassment for herself, her family, and the ramifications of these and others for an expected child, who decided that she would place the baby for adoption. We are not insensitive of mental anguish she must have gone through which resulted in her change of mind and seeking to recover the child, nor without sympathy for the distressful situation this series of events in her life have brought about. On the other hand, a fine married couple, who yearned for and have now obtained a child. They were made aware that one was coming into the world who needed them. They appear to have attempted to comply with every requirement, traveled many hundreds of miles for the purpose; accepted the child as their own; affirm that they have the strongest possible feelings of love and attachment, and are found by the court to have all of the qualifications essential to giving the child a suitable home and parental love and care.

It is acknowledged that in the presence of a controversy over a subject matter so vitally entwined in the strings of human hearts as is this, controversies over the dross of money or property recede in importance; and that it is in such awareness of the grave effects it has upon the lives of those involved that attention should be given to the issues presented.[3]

---

1. Estimates of cost of rearing and education of a child range from $15,000 upward.

2. The Bible: 1 Kings, Chapter 3, Verses 16–28.

3. Taylor v. Waddoups, 121 Utah 279, 241 P.2d 157.

In her attack upon the refusal of the trial court to set aside her release and consent, appellant makes three main points: first, that the court erred in refusing to find that it was signed under duress and undue influence; second, that proper statutory procedures were not followed; and third, there has been a disregard of the rights and status of the natural father.

 The appellant lived with her family in Salt Lake City. In September, 1969, she informed her parents that she was pregnant. After counseling with them, and with an uncle who is a physician, it was decided that she should go to live with his sister in an eastern state until after the birth of her child. While there she was under the regular care of an obstetrician who saw her a total of nine times. She told him on several occasions that it was her decision to put the baby for adoption. She contacted an attorney there, who appears to be reputable and competent, and asked him if he would help her in doing so. In her several conversations with him, which included two visits to his office, the matter of the release of the baby for adoption and its effect was fully discussed. The attorney affirms that he took particular care to explain and impress upon the appellant the effect and the finality of her giving her consent to the adoption of the child.

On December 3, 1969, appellant called the attorney; stated that the baby had been born November 30; that she had been released from the hospital and wanted to sign the consent. That afternoon she and her mother went to the attorney's office. Meanwhile the respondents, acting upon information furnished them, had commenced proceedings looking toward the adoption of the child in the Fourth District Court, Utah County, which had issued a commission to the attorney to take the consent to the adoption.[4] The consent was read to them. A couple of minor corrections were made. Appellant reaffirmed her intention concerning the placement for adoption, but stated that she wanted to take the consent to her motel room that evening and study it.

The next day, December 4, she called the attorney and informed him that she wanted to sign the document. She and her mother went to his office. He says that he again questioned them both fully; and particularly, that he asked appellant if she was sure of her desire, and of her understanding that this would be a full and final relinquishment of her parental rights, to which she answered in the affirmative. She raised her right hand and solemnly swore that she freely and voluntarily executed the consent. That same evening she met the adoptive parents, respondents herein. They had a frank and friendly dis-

4. As authorized by Sec. 78–30–8, U.C.A.1953.

cussion in which they discovered some family connection. In it appellant stated, inter alia, several significant things: that she did not want to marry the father of the baby; that she had decided to place it for adoption; that she was very happy and thankful to meet them and that she was pleased that they would adopt the baby. She assured them that she would never try to search them out or cause them any trouble.

Another attorney (adviser to the hospital) upon examination of the papers, thought that the release should bear the caption of the court (Fourth District Court of Utah County) which had ordered the issuance of the commission, and to whose jurisdiction the release recited that the child was committed for adoption. In accord with his suggestion, the next morning, December 5, 1969, all of the parties met in the office of the attorney; and the whole procedure was gone through again, including explanation of the significance and finality of signing the consent. Appellant was again duly sworn and answered affirmatively concerning her understanding and intent concerning the release, which she then signed; and her mother signed as a witness.

On January 9, 1970, a little over a month after the foregoing events, the father of appellant came to the office of attorney Don R. Petersen, the Utah attorney for the respondents, and was given a check for $1,050 which was to cover the expenses in connection with the birth of the baby, including the doctor and hospital bills. In receiving the money for his daughter he relayed her thanks and her statement that she felt good about the arrangement. She accepted and cashed the check. On July 23, 1970, just short of eight months after the placement, the petition of appellant was filed wtih the District Court seeking to revoke her consent and recover custody of her child, although apparently the petition had been prepared about one month previously.

Relative to the issue of duress and undue influence there are certain ideas to be kept in mind. A foundational one is that the mother of an illegitimate child has the primary right both to its custody and to relinquish that right if for any reason she so desires. If she so decides and freely and voluntarily signs a release and consent for adoption, it is binding the same as any other contract.[5] It is, of course, true that if no rights or interests of third parties have intervened, the courts are quite liberal in permitting the withdrawal of such a consent. But it is otherwise where, as here, adoptive parents have been led to act on it, have gone to great effort and expense, and far more important, have formed attachments for the baby, all in good faith and reliance

---

5. 156 A.L.R. 1011 and cases cited.

upon the request and consent of the parent that they adopt the child. In such circumstances a parent who has voluntarily given consent cannot simply arbitrarily change her mind and withdraw it.[6] Such a duly executed agreement can be avoided only on a showing that it was not entered into voluntarily but was induced through duress or undue influence, or under some misrepresentation or deception, or other ground which would justify release from the obligations of any contract.

It is realized that this proceeding is equitable (sometimes said to be so in the highest degree) in which this court may review the evidence and make its own findings.[7] Nevertheless, as will be seen from what has been said above, the evidence is abundant and clear in support of the trial court's finding that the appellant was not induced to sign the release by duress or undue influence, but that it was her free and voluntary act.

■■ In her attack upon the procedure appellant argues noncompliance with the provisions of our statutes which relate to the placement of children for adoption through licensed child-placing agencies.[8] There is a fallacy in that position in that it assumes that the procedure prescribed therein is the only method sanctioned in our law for adoptions. Having a bearing thereon is Sec. 55–8–2(c), U.C.A.1953, which states:

> * * * no person shall hereafter assign, relinquish or otherwise transfer to another, other than a relative of the child within the second degree, his rights or duties with respect to the permanent care or custody of a child under sixteen years of age, *unless specifically authorized or required so to do by an order or decree of court or* unless the transfer is made to or by an agency.

It is plain to be seen from the emphasized words, and the use of the disjunctive "or," that a child may be relinquished for adoption either to an agency, or as may be ordered by the court. This same problem was dealt with in the case of In Re Adoption of D———[9] in which we stated:

> But release to an agency is certainly not the only way a parent can consent to his child's adoption. Our statutes clearly authorize that consents may be given in the presence of the court and with its approval in other cases.

---

6. See statement in In re Adoption of K_____, 24 Utah 2d 59, 465 P.2d 541; 156 A.L.R. 1011; 2 Am.Jur.2d, Adoption, Sec. 46.

7. Walton v. Coffman, 110 Utah 1, 169 P. 2d 97 and cases cited therein as to appeals

in equity cases, see Utah Constitution, Article VIII, Sec. 9.

8. Secs. 78–30–4 et seq., U.C.A.1953.

9. 122 Utah 525, 252 P.2d 223.

In regard to the procedure where the court itself directs what is to be done, Sec. 78–30–8, U.C.A.1953, provides that:

> The person adopting a child and the child adopted, and the other persons whose consent is necessary, must appear before the district court of the county where the person adopting resides, and the necessary consent must thereupon be signed * * *; provided, that if a person whose consent is necessary is not within the county *the court may*, in the same manner as is or may be provided for the taking of depositions in civil cases, *appoint a commissioner* to examine such person upon his deposition and *to take his written consent* and to certify the same to the court. The commissioner shall explain to such person the legal significance of such consent, and shall certify to the court his findings as to whether or not the consent is freely given. Where such person is within the state of Utah the commission shall issue to a judge of the district court of the county in which such person is located.

In the instant case the procedure specified in the foregoing statute was followed: The attorney having been appointed as commissioner by our Fourth District Court, proceeded in the manner specified; and the District Court made its order pursuant thereto.

Appellant also urges that the trial court's order should be overturned because of improprieties relating to the natural father: that his rights were not safeguarded; that his consent was not obtained; and that he was not allowed to testify. The effective refutation of these contentions is that the so-called "natural father" is not a party to this proceeding; and he has no rights herein.[10] Moreover, the rights of the appellant as the mother of an illegitimate child are primary and preferred over any claims of a putative father. Under the circumstances here, where she had assigned away her own rights, she cannot obtain any advantage to herself by complaining about the matters just stated on his account. In addition to this, in regard to his not being allowed to testify, these further observations are pertinent: first, in response to an interrogatory as to the names of witnesses to be called by appellant the name of the so-called "natural father" was not listed; and second, in view of what has been said above, whatever he may have testified to concerning the child could not in any way have affected the outcome. Though it would not have been error for the trial court to have permitted him to testify, we see no abuse of his discretion which would constitute reversible error in his having refused to do so.

10. This is said in awareness of Sec. 77–60–12, U.C.A.1953, as amended by Chapter 205, S.L.U. 1971.

In cases of this character, looking beyond the admittedly most vital concern: ' of making the best possible judicial determination in regard to the immediate parties, particularly for the child,[11] it is also necessary to keep in mind the effect it will have on serving the needs of society. It is and should be the policy of the law to so operate as to encourage the finding of suitable homes and parents for children in that need. It is obvious that persons who might be willing to accept a child for adoption will be more reluctant to do so if a consenting parent is permitted to arbitrarily charge her mind and revoke the consent, and thus desolate the plan of the adoptive parents and bring to naught all of their time, effort, expense and emotional involvement. If the law were to so operate, there is another lesser but definite evil: the possibility of blackmailing adoptive parents. (It is not suggested that this exists in the instant case, but it is a policy consideration.) A moment's reflection will reveal that to the degree that such commitments are given respect and solidarity, so they can be relied upon, persons desiring children will be willing to accept and give them homes. Conversely, to the degree that such commitments can easily be withdrawn and the adoptive plan thus destroyed, such persons will tend to be discouraged from doing so.[12]

Other errors claimed are without sufficient merit to warrant discussion. Upon the basis of what has been said above, it is our conclusion that the trial court was correct in its view that there is not shown any sufficient basis for revocation of the release and consent; and this case is remanded to the District Court for further proceedings upon the respondents' petition for adoption. (All emphasis added.)

Affirmed. Costs to respondents.

CALLISTER, C. J., and TUCKETT, HENRIOD and ELLETT, JJ., concur.

11. Whose welfare is often said to be the paramount consideration, see: In re Adoption of D_____, footnote 9, supra; Walton v. Coffman, footnote 7, supra, and Kurtz v. Christensen, 61 Utah 1, 209 P. 340.

12. See an excellent opinion by Judge Justin Miller in In Re Adoption of a Minor, 79 U.S.App.D.C. 191, 144 F.2d 644, 156 A.L.R. 1001; also our discussion in In Re Adoption of D_____, footnote 9, supra; and Ex Parte Schultz, 64 Nev. 264, 181 P.2d 585.