**In the Matter of S.**

**No. 15094.**

Supreme Court of Utah.

Dec. 13, 1977.

'Frank J. Allen of Clyde & Pratt, Salt Lake City, for natural parents.

Mary Lou Godbe, Salt Lake City, for adoptive parents.

MAUGHAN, Justice:

The petitioners (hereafter referred to as petitioners or mother, or father), filed a petition to vacate their consent to adoption of their infant daughter. Upon hearing before the trial court, the petition was denied. Petitioners appeal. We affirm. No costs awarded. All statutory references are to U.C.A.1953.

The petitioners have been married twenty-three years and are the parents of two adult daughters. At the time they executed the consent to adoption, the mother was forty-four and the father was fifty-seven years of age. They expressed to the court their age was the reason for the adoption. They also explained they had a family and didn't want any more children.

The consent was executed before the court on May 24, 1976; the petition to vacate was filed August 16, 1976. The infant was placed in an adoptive home on the same day the consent was executed, and has remained with the adoptive parents since that time.

Before the trial court, petitioners claimed the consent to adoption was obtained by the exercise of undue influence on the mother by a social worker. They further urged the methods employed in placing the infant in the adoptive home violated statutory requirements.

■ The trial court ruled that at the time the petitioners executed the consent, it was voluntary, and they were not subject to undue influence or duress. The natural parents of a child have no right arbitrarily, and without cause, to revoke the consent they have executed voluntarily before the court. The court further found that by reason of the age difference between the natural and adoptive parents it would be in the best interest of the child to remain with the latter. The court also found that Sec. 55–8a–1, does not prohibit private placements and adoptions; and that Sec. 78–30–14 does not require completion of the welfare report before the consent to the adoption may be taken from the natural parents.

On appeal, petitioners contend the procedure used to place their child in an adoptive home violated Sec. 55–8a–1(2). The adoptive parents employed an attorney, who filed a petition for adoption on May 21, 1976. On May 24, 1976, petitioners executed their consent. At the same time, the court signed an order authorizing the hospital, where the infant was situated, to release her to the attorney for the purpose of placing the child with the prospective adoptive parents. Petitioners contend the attorney did not have a license to place children as required by Sec. 55–8a–1(2) and that his acts constituted a "placement" within the meaning of Chapter 8a, Title 55.

55–8a–1(2), provides:

No person, agency, firm, corporation or association, or group children homes shall engage in child placing, or solicit money or other assistance for child placing, without having a valid written license from the division of family services.

The foregoing is modified by subsection (3) and subsection (4) of the same statute.

Subsection (3) permits an attorney to assist a parent in identifying or locating a person interested in the adoption of a child of the parent, or assist a person in identifying or locating a child to be adopted.

Subsection (4) specifies: " . . . nor shall any provision of this act abrogate the right of procedures for independent adoption as provided by law."

■ Petitioners claim the reference to independent adoption refers only to the adoption of persons over the age of eighteen or the adoption of an illegitimate child by acknowledgment by his natural father. They urge that since the enactment in 1971 of Chapter 8a, Title 55, nonagency adoptions, with the aforecited exceptions, are prohibited.

Such an interpretation would nullify the procedures for an independent adoption set forth in Chapter 30, Title 78. 78–30–4, provides that a child cannot be adopted without the consent of each living parent having rights in relation to the child. However, the court may order the adoption, without notice to or consent in court of parents, whose consent would otherwise be required, if they have previously released the child to a licensed placement agency. 78–30–14, requires, upon filing a petition for the adoption of a minor child, if it is not filed with the written consent of a licensed child-placing agency; that the division of family services shall make a thorough investigation of the matter and report its findings in writing to the court.

The trial court did not err in its ruling that Chapter 8a, Title 55, did not prohibit private placements and adoptions.

■ Petitioners further contend the investigation of the division of family services required by Sec. 78–30–14 must be completed before the natural parents may execute their consent in court.

There is no specific provision in the statute compelling such an interpretation; in fact, such an interpretation, as a practical matter, would have been incongruous.

The mother was discharged from the hospital, and left her infant daughter in the nursery. She testified she knew she had the right to take her child and return to her home. Petitioners were the only ones with custodial rights in their child. Without their consent, no one could have removed the child from the nursery, or have taken custody for the purpose of placing her in a prospective adoptive home.

Under the provision of Sec. 78–30–14, there would be a potential interval of sixty-five days from the time of filing the petition for adoption until the investigative report was made to the court. Petitioners do not proffer any suggestions as to who would provide care and sustenance for the infant in the interim. Furthermore, it would be unlikely prospective adoptive parents would be willing to make the requisite financial and emotional commitments involved, in taking an infant into their home, without an assurance the natural parents had consented to the adoption.

In this case, the adoptive mother terminated her employment to care for the infant. The adoptive parents purchased the necessary equipment and clothing for the child; they paid the portion of the mother's hospital expenses that were not covered by insurance; and they employed counsel to handle the adoption proceedings. To interpret the statute as urged by petitioners would mean the natural parents in any independent adoption would retain their complete parental rights to the detriment of the prospective adoptive parents during the investigative period. The statute does not reveal such a legislative intent. It does indicate a legislative intention to assure that a minor child, in an independent adoption, will be placed with fit and proper parents. The obvious purpose is to protect the child and not the natural parents. The trial court correctly ruled that the report required by 78–30–14 did not have to be completed before the natural parents consent to adoption.

Finally petitioners contend the consent of the mother was not free and voluntary, but was induced by the undue influence of a

social worker. The facts in the record do not sustain this contention.

■ Petitioners went to the Utah Women's Clinic on March 10, 1976, for the purpose of procuring an abortion. Such a procedure could not be performed, because of the stage of the pregnancy (28 weeks). The clinic employed a social worker, Mrs. B, who acted as a crisis-intervention counselor. Mrs. B's duty is to inform women seeking abortions of alternatives to this procedure. Petitioners were adamant that they didn't want a child. Mrs. B suggested adoption as an alternative, and for them to discuss it; before they returned for the next prenatal checkup—four weeks later.

At the next meeting, the petitioners stated they didn't want anyone to know of the pregnancy, and they didn't want to be parents; because of their health and age. The father had had surgery on his back, stomach, and kidneys and he was uncertain as to the number of years he would be gainfully employed. He was concerned that he would be in his seventies when the child was a teenager. The mother expressed a fear she would be left alone with a child to rear. The petitioners had informed their adult children the mother had a fibroid tumor, which she was to have surgically removed. The petitioners stated they wanted a private adoption, and Mrs. B put them in contact with an attorney. Both the attorney and Mrs. B repeatedly informed petitioners that they were in no way committed to an adoption, until they executed their consent in court.

Mrs. B described her role as assisting the petitioners in exploring alternatives, to present factual information, and to let them make up their minds. Mrs. B met with petitioners five times: March 10, March 11, April 14, May 19, and May 21, 1976. After her last meeting with the petitioners (the day after the birth of the child) she did not know what their decision was.

The record indicates the petitioners discussed the matter almost daily after March 10, 1976. They conferred with nurses in the hospital and a member of their religious faith, who was a trained counselor. Perhaps the mother expressed her frustration most accurately when she testified no one told her not to do it. The record indicates everyone told them they must make the decision.

The trial judge before whom the consents were executed testified he was particularly interested why a married couple would consent to an adoption. They indicated their reason was their age. The judge verified that the petitioners understood they were waiving their parental rights. The judge testified the mother was distraught and in tears. For this reason he placed particular emphasis on her testimony to make sure she understood her rights, and that her consent was given freely and voluntarily. The judge expressed the opinion the mother was not reluctant in giving her consent, but was emotional about it. There was no question in the judge's mind she fully understood the procedure.

Although there is no specific statutory provision prohibiting a change of mind and revocation of a consent by a parent executed before a court, such a proviso is unnecessary. 78–30–8 requires the consent to be given in the presence of, and with, the approval of the court. Such a provision certainly indicates a consent so executed would be valid and binding. Under such circumstances the court should be able to judge whether the consent should be given and whether it is given freely and voluntarily.[1] When consent is given in court before a judge, there is a presumption of regularity.[2]

■ When a parent voluntarily signs a release and consent for adoption, it is binding as any other contract. If the rights or interests of third parties have not intervened, the courts liberally permit withdrawal of such consent. It is otherwise, where adoptive parents, in reliance and good faith, have expended effort and ex-

1. *In re Adoption of D_____*, 122 Utah 525, 539, 252 P.2d 223 (1953).

2. *In re Adoption of K,* 24 Utah 2d 59, 465 P.2d 541 (1970).

pense and formed emotional attachments, based on the consent of the natural parent. Under such circumstances, a parent, who has voluntarily given consent, cannot change his mind and arbitrarily withdraw it.

■ A duly executed consent can be avoided only by showing the agreement was not entered into voluntarily but was induced through duress, undue influence, or under some misrepresentation or deception; or other grounds which would justify release from the obligations of any contract.[3]

The language in *In re Adoption of K*[4] is particularly applicable to the facts herein:

.  .  .  In this matter there was no finding of any fraud or undue influence on the part of the adoptive parents or of anyone else.  True it is that at the time of giving her consent the respondent [mother] was emotional; but that is a condition to be expected of any mother when she gives up a child.  Her consenting was voluntary and given with full knowledge of the consequences.

As herein, the presiding judge was satisfied the consent was freely given and the mother knew and understood the consequences.  A careful review of the record indicates there is no basis to justify setting aside the consent of petitioners.

ELLETT, C. J., and CROCKETT, WILKINS and HALL, JJ., concur.

---

**3.**  *In re Adoption of F.*, 26 Utah 2d 255, 259–260, 488 P.2d 130 (1971).

**4.**  Note 2, supra, 24 Utah 2d at p. 61, 465 P.2d at p. 542.